**Ramon BALUT, Plaintiff,**

**v.**

**LORAL ELECTRONIC SYSTEMS and Loral Corporation, Defendants.**

**No. 95 Civ. 4011(WCC).**

United States District Court,
S.D. New York.

Dec. 17, 1997.

Pirrotti & Pirrotti, Ardsley, NY, for Plaintiff; Anthony J. Pirrotti, Jr., of counsel.

Pearl & MacKenzie, P.C., Syosset, NY, for Defendants; Carol MacKenzie, Dawn Davidson Drantch, Bonnie Lou Santosus, of counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Ramon Balut brings this action against defendants Loral Electronic Systems ("LES") and Loral Corporation ("Loral"), alleging defendants terminated his employment on account of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.

### BACKGROUND

From August 1979 to June 1994, Balut was employed by LES, first as Director of Programs, then as Program Director and ultimately, as Senior Production Program Manager on the company's ALQ–131 program. LES was one of Loral's three subsidiaries, until April, 1996, when LES was acquired by Lockheed Martin Fairchild Defense Systems.

On or about May 20, 1994, Joseph Browdy, Balut's immediate supervisor, informed Balut that he was being laid off, effective July 15, 1994, due to a "general reduction in force" at LES. Balut alleges that during this meeting, Browdy stated, "in words or substance," "we are also letting Mr. T.K. Lee go. He is the older engineer with health problems. He is happy we are letting him go because he'll be able to draw unemployment and get his severance pay. Maybe you'll feel the same way." Pl.'s R. 56.1 Stmt. ¶ 11. At the time Balut was notified of the layoff, he was fifty-seven years old. He had worked at LES for fifteen years, had achieved the title of Senior Production Program Manager, and had received consistent performance ratings of "commendable," "proficient," or "exceeded minimum requirements." Balut left LES in May 1994.

In June, 1994, Balut's responsibilities on the ALQ–131 were assumed by Mike Hallisy, a Senior Production Program Manager who had worked on the ALQ–178. Hallisy was forty-seven years old. Also in 1994, LES hired Mike Pinto as Director of Program ALQ–178 and New Business. Pinto was then "train[ed] to become the number one ALQ–178 director" and ultimately "head[ed] the 178 program." Silverman Dep. at 86, ¶¶ 23–24; 87, ¶¶ 9–10. Pinto was forty-two years old. Also in 1994, but before Balut was laid off, Angelo Germani was hired as a Program Manager on the ALQ–131.

On November 21, 1994, Balut filed a charge of age discrimination with the New York State Division of Human Rights, alleging that LES had "fired" him on account of his age and that his job "was filled by an employee ... transferred from another program ... who [was] significantly younger." Pl.'s Ex. Q at ¶¶ 3–4. LES answered the charge on December 6, 1994, denying that Balut was "fired," or discriminated against based on his age. Pl.'s Ex. O at § C, ¶¶ 3, 5–6. Rather, LES claimed that Balut's employment "ceased ... due to a reduction in force ... [which had reduced] Loral['s] labor force ... by 44% [between] May 18, 1990 to November 25, 1994." Id., at ¶ 4. The administrative charge was ultimately dismissed.

Following the dismissal, Balut commenced this action on June 2, 1995. Balut alleged discrimination based on age in violation of the ADEA and also breach of contract against LES and Loral. Balut voluntarily withdrew his breach of contract claim on July 25, 1997. The parties now move for summary judgment pursuant to FED. R. CIV. P. 56.

For the following reasons, defendants' motion is granted and plaintiff's motion is denied.

### DISCUSSION

I. *Summary Judgment Standard*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could

find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Id.* at 255, 106 S.Ct. at 2513. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable considering the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.1987).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2510–11 At this stage, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

Summary judgment should be used sparingly in employment discrimination cases where the employer's intent, motivation, or state of mind is at issue. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985)). A plaintiff "must nevertheless offer 'concrete evidence from which a reasonable juror could return a verdict in his favor,' . . . and is not entitled to a trial simply because

the determinative issue focuses upon the defendant's state of mind." *Dister,* 859 F.2d at 1114 (internal citation omitted). Moreover, "the summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive, and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri,* 759 F.2d at 998. This is particularly true where, as here, discovery has taken place. *Dister,* 859 F.2d at 1114.

Local Rule 56.1(a) provides that upon any motion for summary judgment, "there shall be annexed to the notice of motion a . . . statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." Balut urges us not to consider defendants' motion, because they have failed to file a Rule 56.1 statement, formerly known as a Rule 3(g) statement.[1] While the Court may deny defendants' motion on this ground, we are not required to do so and may overlook the "technical deficiency" of a party's submission. *Thaler v. Casella,* 960 F.Supp. 691, 697 (S.D.N.Y.1997); *Zeno v. Cropper,* 650 F.Supp. 138, 139 (S.D.N.Y.1986) (citing *Reisner v. General Motors Corp.,* 511 F.Supp. 1167, 1174–75 n. 14–15 (S.D.N.Y.), *aff'd,* 671 F.2d 91 (2d Cir.1982)). The Court notes that Balut has cross-moved for summary judgment and the parties have stipulated to consolidate their motions. Because Balut has submitted two such statements, defendants have responded to each one, and these motions have been consolidated for the purposes of this decision, we cannot say that Balut has been prejudiced by defendants' failure to file a Rule 56.1 statement. The Court also notes that the issues of fact which are in dispute are set forth in defendants' affidavits. We therefore "decline to use this procedural er-

---

1. The Rule governing Statements of Material Fact on motions for summary judgment is now denominated Local Rule 56.1, effective April 15, 1997. Since the parties moved for summary

judgment subsequent to that date, the Court will refer to any such statements as Rule 56.1 statements ("R. 56.1 Stmt.").

ror as a means to deny defendants' otherwise meritorious motion." *Thaler*, 960 F.Supp. at 697.

In their motion papers, defendants contend that the action should be dismissed against Loral, because Loral was not Balut's employer. Additionally, defendants argue that the case should be dismissed in its entirety, because Balut does not state a prima facie case for age discrimination, or alternatively, because defendants have proffered a legitimate, nondiscriminatory reason for Balut's discharge and Balut has failed to show pretext. We consider these points in turn.

## II. *Employer Liability*

First, defendants argue that the case against Loral must be dismissed, because Loral was not Balut's employer. To establish a case for employment discrimination, plaintiff must set forth sufficient facts to show, *inter alia*, that defendants employed him. 28 U.S.C. § 623. Whether Loral may be held liable for any discrimination by LES against Balut depends on whether Loral was Balut's employer.

▆▆ The law allows a corporation to organize in ways that isolate liabilities among separate entities. *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir.1996) (citing *Frank v. U.S. West*, 3 F.3d 1357, 1362 (10th Cir.1993)). Under the doctrine of limited liability, a parent is liable for the acts of its subsidiary only under "extraordinary circumstances." *Id.* The doctrine therefore creates a strong presumption that a parent is not the employer of its subsidiary's employees. *Frank*, 3 F.3d at 1362.

▆▆ The Court of Appeals for the Second Circuit has recently adopted a four-part test to determine a parent's liability for the acts of its subsidiary. In *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995), the court determined that a parent could not be held liable for its subsidiary's civil rights violations, unless the parent and subsidiary were a "single, integrated enterprise," namely, that the companies maintained (1) interrelated operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *Id.* (citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir.1983)). The court added that the one " 'critical question' " was the following: " 'What entity made the final decisions regarding employment matters related to the person claiming discrimination?' " *Id.* (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983)). The court then held that a plaintiff could satisfy the four-part test upon " 'showing that there is an amount of participation [by the parent that] is sufficient and necessary to the total employment process [of the subsidiary], even absent total control or ultimate authority over hiring decisions.' " *Id.* (quoting *Armbruster*, 711 F.2d at 1338).

In *Cook*, the Court of Appeals reversed an order granting summary judgment to the defendant where there existed "substantial evidence" that the parent had run the subsidiary "in a direct, hands-on fashion, establishing the [subsidiary's] operating ... and management practices," screening the subsidiary's employment applications, approving all the subsidiary's personnel reports, and reviewing "all major employment decisions." *Id.* at 1241. The court stressed the second factor of the test—centralized control of labor relations—noting that the plaintiff "was herself hired" by the parent's vice president of human resources and "was fired directly" by an employee paid by the parent. *Id.* Finally, the court noted that the companies "maintained a common management structure," whereby the parent's president "operated out of" the subsidiary's office. *Id.*

In *Regan v. In the Heat of the Nite, Inc.*, No. 93 Civ. 862, 1995 WL 413249, at *4 (S.D.N.Y. July 12, 1995),[2] the court denied defendant's motion for summary judgment where plaintiff had put forward undisputed evidence that "employees of the various taverns and restaurants ... rotate[d] informally among the ... establishments," when they were "short-staffed," "employee records, payroll records, and bank deposits ... [were] kept together," and the president, sole shareholder and principal shareholder of the respective establishments hired all managers

---

**2.** Though a pre-*Cook* case, the Court notes that it relies on the same authorities as *Cook*.

and supervisors. *Id.* at *3. Additionally, the defendants were located "in the same office." *Id.* at *1.

In *Dortz v. City of New York,* 904 F.Supp. 127, 145–47 (S.D.N.Y.1995), the court denied summary judgment to defendants where the record suggested that Mt. Sinai School of Medicine was plaintiff's "simultaneous" employer. In that case, the evidence showed that "[a]ll of [p]laintiff's direct superiors who determined the conditions of her employment . . . were Sinai employees," plaintiff received her promotion due to a "favorable evaluation from . . . Sinai employee[s]," and plaintiff herself "was required to seek [Sinai's] approval on all matters related to policy." *Id.* at 145. Furthermore, defendants conceded that Sinai "jointly exercised control over certain operations [of the other defendants]," such as supervising the other defendants' employees. *Id.* at 146.

In *Harris v. New York Times,* No. 90 Civ. 5235, 1993 WL 42773, at *12 (S.D.N.Y. Feb. 1993),[3] the court determined that a parent and subsidiary were a single employer where the subsidiary's president "shuttled back and forth between [the parent] and its [other] subsidiaries upon a number of occasions," was an officer of the parent's other subsidiaries, and the subsidiary had "no policies [or] practices independent of" its parent.

In *Dewey v. PTT Telecom Netherlands, U.S., Inc.,* No. 94 Civ.5983, 1995 WL 425005, at *2 (S.D.N.Y.1995), *aff'd,* 101 F.3d 1392 (2d Cir.1996), the court declined to find single employer status where plaintiff had alleged that the parent had been "immediately informed" of the subsidiary's decision to hire and fire plaintiff. The court held that plaintiff had failed to show that the parent had participated in the subsidiary's "employment process to any degree inconsistent with that of a normal parent/subsidiary relationship." *Id.*

3. *See supra* note 2.

4. *See supra* note 2.

5. *See supra* note 2. The *Cook* court relied in part on *Frishberg. Cook,* 69 F.3d at 1241.

6. The evidence supports that Balut discussed the ALQ–131 by telephone on a weekly basis with

In *Kelber v. Forest Elec. Corp.,* 799 F.Supp. 326, 331 (S.D.N.Y.1992), the court granted summary judgment to defendants where the two subsidiaries shared the same parent, common offices, and certain high level management. Of importance to the court was the fact that "field operations . . . for the two companies [were] separate." *Id.*

In *Kellett v. Glaxo Enterprises, Inc.,* No. 91 Civ. 6237, 1994 WL 669975, at *5 (S.D.N.Y. Nov.30, 1994),[4] the court granted summary judgment to defendants despite the fact that plaintiff had alleged, among other things, "a common package of benefits; central control of personnel and operations, central control of bonuses and salaries . . . common ownership of each corporate entity" and central control of management.

Finally, in *Frishberg v. Esprit de Corp., Inc.,* 778 F.Supp. 793, 799–800 (S.D.N.Y. 1991),[5] *aff'd,* 969 F.2d 1042 (2d Cir.1992), the court found the single employer doctrine inapplicable where the parent "had little control over the manner which [the subsidiary] and its employees performed their job." While the subsidiary had weekly contact with the parent, the subsidiary had "developed [its] own accounts, set [its] own schedules, kept [its own] hours, and operated largely without direct supervision" from the parent. *See id.*

### 1. *Interrelation of Operations*

Plaintiff has not shown that Loral and LES were an integrated enterprise. First, plaintiff has failed to demonstrate an interrelation of operations. Plaintiff attempts to show an interrelationship by alleging that Loral's review of LES' "operating plan" and bids above a certain ceiling constituted centralized control of operations. The fact that Loral reviewed LES' operations biannually, however, does not demonstrate an interrelationship, because a parent typically reviews a subsidiary's progress on a periodic basis.[6]

Frank Lanza, Loral's president, but that these conversations lasted approximately ten minutes. *See* Lanza Dep. at 32, ¶¶ 7–14. Additionally, Lanza states that he spoke with LES' president "an average of several times a week," and visited "LES . . . at least once every six weeks . . . to review their programs." *Id.* at 52, ¶¶ 12–15. Furthermore, Balut states that Lanza "had regu-

*See Frank,* 3 F.3d at 1362. Neither does the fact that Loral reviewed bids above ten million dollars suggest such relationship. The evidence establishes that individual bids, as well as notifications, were communicated directly, and that LES procured its own contracts. Lanza Dep. at 47, ¶ 18–20; 51, ¶ 15–25, 62, ¶ 19–20, 63, ¶ 14–18. Furthermore, as opposed to the cases in which courts have found an interrelationship, LES employees, if transferred, were transferred among subsidiaries "annually," and not on a day-to-day basis. Santoro Dep. at 37, ¶¶ 24–25; 38, ¶¶ 2–7. *Cf. Johnson v. Flowers Indus. Inc.,* 814 F.2d 978, 981 (4th Cir.1987); *Regan,* 1995 WL 413249, at *4; *Perry v. Manocherian,* 675 F.Supp. 1417, 1426 (S.D.N.Y.1987). Finally, the record establishes that far from sharing common office space, LES and Loral's offices were located in different counties. *See* Pl.'s Dep. at 31, ¶ 13. *Cf. Cook,* 69 F.3d at 1241; *Regan,* 1995 WL 413249, at *4. We therefore decline to hold that the operations of Loral and LES were interrelated, to the extent required by *Cook.*

### 2. *Centralized Control of Labor Relations*

■ Second, Balut has not shown that Loral controlled LES' labor relations. Importantly, Balut has not demonstrated that Loral hired, transferred, reviewed or fired him. *Cf. Cook,* 69 F.3d at 1240–41. Though the evidence suggests that Frank Lanza—who was at one point Loral's president—interviewed and offered Balut employment, *e.g.,* amd. cplt. at ¶¶ 15, 17; Balut Dep. at 21, ¶¶ 18–22; 24, ¶¶ 3–4, it is uncontroverted that when Lanza hired him, Lanza worked for LES. Balut Dep. at 30, ¶¶ 10–11. Furthermore, Balut's performance evaluations were signed by LES supervisors on LES forms, and were conducted and reviewed solely by LES. *E.g., Kellett,* 1994 WL 669975, at *5; Silverman Dep. at 20, ¶¶ 17–20, 22, at ¶¶ 3–5. *Cf. Cook,* 69 F.3d at 1241. When Balut was transferred from LES' Yonkers facility to the Bronx, it was Murray Silverman, LES' Executive Vice President, not anyone at Loral, who transferred him. Sil-

verman Dep. at 28, ¶¶ 10–12; 29, ¶ 6. Plaintiff also states that Silverman "was the guy who made the final decision to fire [him]." Balut Dep. at 54, ¶¶ 10, 12–13. Finally, Balut admits that Browdy notified him of his layoff. *Id.* at 31, ¶¶ 5–7.

■ That Lanza "was advised of" the layoffs, "reviewed and approved" Balut's termination and helped him try to find another job does not persuade us otherwise. First, the fact that LES notified Loral of its decision to lay off certain employees does not "show that [Loral] exercised control over [LES'] employment practices, but rather that [LES] kept its parent informed of employment decisions it made." *Dewey,* 1995 WL 425005, at *2. Second, though Balut alleges that Lanza "reviewed and approved" his termination, Lanza himself testified that he was only "advised" generally of the LES layoffs. Balut does not offer any evidence other than this conclusory remark to back his allegations. Balut is not entitled to a trial based on "conjecture or surmise." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (quoting *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991)). Third, the fact that a parent assists a subsidiary's employee in locating other employment within the company's group does not indicate centralized control of labor relations where the parent typically provides such assistance. *See, e.g., Curto v. Sears Roebuck & Co.,* No. 82 Civ. 1576, 1984 WL 1043, at *8 (N.D.Ill. June 14, 1984) (where policy was to "check to see if a position ... was available," parent "fulfilled its obligations under the ADEA," having "exercised its policy with respect to the plaintiff"); *Owen v. Western Elec. Co.,* No. 77 Civ. 513, 1979 WL 99, at *3 (M.D.N.C. Dec.17, 1979) (parent's intercompany transfer program did "not transform [parent] into an 'employer' of the plaintiff"). To hold otherwise would deter a parent from making referrals for valued employees, by transforming a common courtesy into a means of "control." In this case, the uncontroverted evidence is that Lanza "normally directs" such

---

lar contact with [LES' executive vice president] ... [perhaps] as often as every day." Pl.'s R. 56.1 Stmt. at ¶ 30. When taken in context of the other facts of the case, however, these conversa-

tions fail to demonstrate that Loral and LES were a single employer. *Cf. Dortz,* 904 F.Supp. at 145–47.

requests to Loral's personnel department to "see if there [are other] opportunit[ies]" at Loral or one of its subsidiaries. Lanza Dep. at 41, ¶¶ 6–16.

Furthermore, the fact that the companies maintained the same benefits does not suggest centralized control of labor relations. The fact is that LES maintained its own personnel files, and LES' human resources manager worked solely for LES and "handled all of LES' personnel functions." Warner Dep. at 7, ¶¶ 7–9; 28, ¶¶ 2–11; 27, ¶¶ 19–21, 43, ¶¶ 13–21; Santoro Dep. at 15, ¶¶ 22–25; at 16, ¶¶ 2–4. Furthermore, "[a] parent's broad general policy statements regarding employment . . . are not enough." *Frank*, 3 F.3d at 1363. Given the facts of this case, plaintiff has not shown sufficient involvement by a parent to arise to the level of "necessary . . . participation . . . in the employment process." *Cf. Cook*, 69 F.3d at 1240.

### 3. *Common Management*

Third, Balut has not submitted evidence sufficient to show common management. As opposed to the cases previously discussed, the fact that Balut and others presented biannual reviews to Loral and discussed some issues on a weekly basis does not show "common management." This is no more than what a parent typically requires of a subsidiary. *See, e.g., Frank*, 3 F.3d at 1362. Furthermore, the evidence demonstrates that LES maintained a separate hierarchy, where only LES' president reported to Loral. *See, e.g., id.* ("[M]erely because project supervisors ultimately report[] to [the parent's] officers . . . is not enough . . . . this exercise of control [does] not . . . exceed[] the control normally exercised by a parent"). *Cf. Kelber*, 799 F.Supp. at 331 (parent and subsidiary separate for Title VII purposes even though high-level managers performed functions for both companies).

### 4. *Common Ownership or Financial Control*

Finally, beyond showing that LES was Loral's subsidiary, plaintiff does not allege—nor submit any evidence indicating—that Loral and LES were commonly owned. As previously stated, the mere fact of a parent-subsidiary relationship does not trigger liability. *Murray*, 74 F.3d at 404. There is no evidence indicating that Loral and LES were controlled by any one individual or group. *Cf. Armbruster*, 711 F.2d at 1338; *Regan*, 1995 WL 413249, at *4.

Because the integrated enterprise doctrine is reserved for the "exceptional" case, we decline to hold that Loral was Balut's employer. Balut has not adduced sufficient evidence to show that Loral's relationship with LES was "hands-on." Loral required no more of LES than what a parent typically expects of its subsidiary. Even if, in the light most favorable to Balut, the meetings between LES and Loral suggest common management or an interrelation of operations, the other evidence overwhelmingly supports the fact that virtually all other functions were separate, particularly the companies' labor relations. As previously stated, this last factor is the most indicative of an integrated enterprise in this circuit.

Since Loral was not Balut's employer, it may not be held liable for LES' treatment of Balut, and certainly not any alleged discrimination in laying off Balut. Thus, we dismiss the case against Loral.

### III. *Age Discrimination*

There is another ground for dismissing the case against Loral. Even if Loral could be considered Balut's employer, Balut has failed to show age discrimination on the part of LES. Thus, Balut's case against both defendants must be dismissed.

The ADEA prohibits employers from discriminating in hiring, discharge, or the setting of "compensation, terms, conditions, or privileges of employment" by reason of an employee's age. 29 U.S.C. § 623(a)(1). Protection under the ADEA extends only to those individuals who are over forty-years-old. *Id.*, § 631(a). ADEA claims are analyzed under the same framework as claims under Title VII. *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997) (citations omitted).

In order to establish a prima facie case of discrimination under the ADEA pursuant to a reduction in force, a plaintiff must show (1) that he was within the protect-

ed age group, (2) that he was qualified for the position at issue, (3) that he suffered an adverse employment decision, and (4) the discharge occurred under circumstances giving rise to an inference of age discrimination. *Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir.1994); *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 104 (2d Cir.1989).[7] This inference "may be shown by direct evidence, statistical evidence, or circumstantial evidence such as documentation of preference for younger employees." *Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir.1991). The burden of establishing a prima facie case "is not onerous." *Fisher*, 114 F.3d at 1335 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)).

 If the plaintiff demonstrates a prima facie case, a presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Any such reason will suffice; an employer " 'need not persuade the court that it was actually motivated by the proffered reasons' in order to nullify the presumption and obligate the plaintiff to satisfy the burden of proof." *Fisher*, 114 F.3d at 1335–36 (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). If the employer satisfies its burden, any presumption of discrimination "simply drops out of the picture." *Hicks*, 509 U.S. at 510, 113 S.Ct. at 2749. The plaintiff may then prevail only if he can show by a preponderance of the evidence that the employer's proffered explanations are pretextual, "either because

the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Fisher*, 114 F.3d at 1339. A plaintiff does not win merely by proving the asserted reason to be false; rather, an employer's proffered reason must be false and its real reason, unlawful. *Hicks*, 509 U.S. at 515–16, 113 S.Ct. at 2751–52; *Fisher*, 114 F.3d at 1338–39; *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995). In other words, the burden-shifting framework does not alter the fact that the plaintiff at all times bears the burden of persuading the trier of fact that the defendant unlawfully discriminated against him. *Quaratino*, 71 F.3d at 64. With the presumption no longer operating, "[t]he question becomes the same question asked in any other civil case: Has the plaintiff shown, by a preponderance of the evidence, that the defendant is liable for the alleged conduct?" *Fisher*, 114 F.3d at 1336.

### A. *Balut's Prima Facie Case*

The parties do not contest that Balut was over forty years of age when he was laid off; that he was qualified for the position at issue and that he suffered an adverse employment decision. The parties do contest whether Balut's discharge occurred under circumstances giving rise to an inference of discrimination.

 To show such inference, Balut offers a myriad of evidence. First, Balut points to a statement allegedly made by Browdy when he notified Balut of his termination. According to Balut:

" 'When I was talking to Mr. Browdy, he mentioned that LES was also letting Mr.

---

7. "In a reduction in force case or a structural reorganization case ... it is sufficient [for plaintiff to show] that the discharge occur[red] in circumstances giving rise to an inference of age discrimination." *Montana*, 869 F.2d at 105. *Raskin*, 125 F.3d at 63–64, and *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc) do not hold otherwise. In these cases, the Court of Appeals held that an ADEA plaintiff must demonstrate that the position at issue was ultimately filled by "a person not of the protected class." *Raskin*, 125 F.3d at 63–64; *Fisher*, 114 F.3d at 1335. Both these cases, however, were for a "failure to promote," whereas *Montana* concerned a reorganization. To hold that a

plaintiff could not otherwise show discrimination would be nonsensical, given the factual distinctions among these cases. *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973) ("The facts necessarily will vary in [employment discrimination] cases, and ... the prima facie proof required [here] ... is not necessarily applicable ... to differing factual situations."); *Ross v. Arcata Graphics Co.*, 788 F.Supp. 1298, 1305 (W.D.N.Y.1992) ("[T]he last [requirement] is different in order to account for the fact that in a reduction in work-force case there will [not always] be ... [a] younger employee hired.").

T.K. Lee go and referred to him as the older engineer with health problems that triggered me to think. Then [Browdy] said to me [that Lee] is happy that [LES was] letting him go because he'll be able to draw [u]nemployment or whatever and get his severance pay, and [Browdy] said to me, 'Maybe you feel the same way.' "

Balut Dep. at 49, ¶¶ 21–25; 50, ¶¶ 2–4. We conclude that this comment was at most a "stray remark," " 'insufficient to establish discrimination, and [therefore] insufficient to trigger a burden shift or to avoid summary judgment. . . .' " *Spence v. Maryland Casualty Co.*, 803 F.Supp. 649, 668 (W.D.N.Y.1992) (quoting *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990)), *aff'd*, 995 F.2d 1147 (2d Cir.1993). " '[I]solated and ambiguous statements . . . "are too abstract" . . . to support a finding of age discrimination.' " *Id.* (quoting *Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989)). Thus, even though the comment was allegedly made by Browdy, a person admittedly involved in determining Balut's employment, *see Raskin*, 125 F.3d at 63, "the quoted remarks are ambiguous," as a matter of law, *see Spence*, 803 F.Supp. at 668. That is, no rational juror could find that by referring to Lee as "an older engineer with health problems," Browdy meant that Balut was "old," or that he was laid off because of his age. *See Raskin*, 125 F.3d at 62 n. 3, 65 (president's comment "that he believed someone [plaintiff's] age might not want to accept the challenge" and should not "change paths at . . . a 'late stage' . . . in [his] career" did not create inference); *Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 224 (2d Cir.1997) ("isolated remarks allegedly made by [supervisor] commenting critically on the ages of several female employees . . . none of [which] was directed at [plaintiff]" insufficient to raise inference); *Habermann v. Brown, Harris Stevens, Inc.*, No. 93 Civ. 4348, 1994 WL 573290, at *6 (S.D.N.Y. Oct.18, 1994) (supervisor's comment that "[s]ome people are going to be terminated soon . . . especially you . . . being you are over 40" held insufficient); *Spence*, 803 F.Supp. at 667–68 (supervisor's comment that plaintiff was "over the hill," and "because of [his] age . . . it would be difficult for [him] to conform to [the job]"

insufficient as a matter of law); *Beers v. NYNEX Material Enterprises Co.*, No. 88 Civ. 0305, 1992 WL 8299, at *9 (S.D.N.Y. Jan.13, 1992) (questions regarding plaintiff's retirement and education plans insufficient, even if supervisor meant "at your age"); *DeSoignies v. Credit Lyonnais*, 617 F.Supp. 707, 711 (S.D.N.Y.1985) (statement by head of personnel that "the bank was looking for good, young, aggressive people," made on same day as plaintiff's termination, insufficient).

██ Balut also argues that the fact that Hallisy, who is "significantly younger" than Balut, replaced him on the ALQ–131 demonstrates an inference of discrimination. The Court notes that while Hallisy is ten years younger than Balut, at the time of Balut's layoff, Hallisy was forty-seven years old, and was therefore a member of the protected class. Thus, Balut's argument runs counter to the ruling of the Court of Appeals, which has held that to show an inference based upon the loss of a job to another, the person receiving the position must be *"not of the protected class." Raskin*, 125 F.3d at 63–64; *Fisher*, 114 F.3d at 1335 (emphasis added). Because Hallisy also belonged to the protected class, this evidence does not show a discriminatory inference. *Accord Beers*, 1992 WL 8299, at *12; *Wolfe v. Time Inc.*, 702 F.Supp. 1045, 1049 (S.D.N.Y.1989).

Since Balut has failed to submit sufficient evidence to support a prima facie case of age discrimination, his case must be dismissed. *See Raskin*, 125 F.3d at 65, 68.

## B. *Defendants' Legitimate, Nondiscriminatory Reason*

██ Even assuming arguendo that Balut's evidence creates an inference of age discrimination, defendants have offered a legitimate, nondiscriminatory reason for laying him off. Defendants state that Balut was laid off pursuant to a "general reduction in force," "based purely on . . . business concerns." *See* Browdy Aff. at ¶¶ 8–9, 23. At the time of Balut's lay off, LES was in "a downturn in [the product] division [and] had been for several years." Silverman Dep. at 63, ¶¶ 7–8. Before laying off Balut, LES had

determined that it was necessary to reduce the number of senior level program managers, because LES "couldn't support the cost of the . . . management team." Browdy Aff. at ¶¶ 10, 16. LES had also determined that given these restraints, it would be best for the company to retain those managers who were the most technically trained. *See id.* at ¶ 11. Particularly, LES concluded that the needs of the ALQ–131 program "had become more technical in nature," and that "looking forward to what new work [LES was] bringing in or could bring in on either the 131 or any other program [to which Balut] might be assigned, the task would be best served by someone" who was "more technically knowledgeable ." *Id.* at ¶¶ 13, 16. Upon comparing Balut to his colleagues, it was decided that Balut's "technical judgment was inferior." *Id.* at ¶ 15. In coming to this conclusion, LES took into consideration Hallisy's bachelors degree in electrical engineering, his professional engineering license, and his work experience as an engineering manager. *Id.* at ¶ 13. In contrast, Balut lacked an engineering degree and engineering experience. "His skills were limited to non-technical aspects of program management." *Id.* at ¶ 14. Therefore, LES concluded that the ALQ–131 "would be best served by" Hallisy. *Id.* at ¶ 16. Defendants' reasons are legitimate, *see, e.g., de la Cruz v. New York City Human Resources Admin.,* 82 F.3d 16, 22 (2d Cir.1996) ("[i]t is not discrimination to replace a qualified worker with a more qualified worker"); *Woroski,* 31 F.3d at 109 (employer proffered legitimate reason where employer had determined that remaining employees "also 40 or older" were "more senior" and "capable"), and we decline to " 'sit as a super-personnel department that reexamines an entity's business decisions,' " *Scaria v. Rubin,* 117 F.3d 652, 655 (2d Cir. 1997) (quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)).

## C. *Pretext*

In response, Balut contends that defendants' reasons are pretextual. First, Balut states that various program managers continued working at LES, that another program manager, in addition to Hallisy, was transferred to the ALQ–131, and that a new program manager was hired. Pl.'s Mem. in Opp'n to Defs.' Mot. for S.J. and in Supp. of Pl.'s Mot. for S.J. at 17. Second, he alleges that the value of the ALQ–131 contracts increased by 444% during 1994 and therefore, the program obviously was not "being completed." *Id.* at 18. Third, Balut states that immediately after he was laid off, the ALQ–131 acquired four contracts worth at least $84,950,000. *Id.* at 22. Fourth, he posits that defendants' proffered reasons for the layoff "were not only inconsistent, but were exactly the opposite." *Id.* at 27. Fifth, Balut argues that defendants have "changed" their reasons for laying him off both during and after the administrative proceeding. *Id.* at 29–43. Finally, Balut states that defendants have "failed to submit a single affidavit or point to *any* admissible evidence" to refute his allegations. Pl.'s Mem. of Law in Further Supp. of Mot. for S.J. at 7. (Emphasis in original). For the following reasons, each of Balut's contentions lacks merit.

First, the fact that other program managers continued to work at LES has nothing to do with defendants' proffered need to reduce senior management. The uncontroverted facts are that LES had only three senior program managers, any one of whom could have been discharged. The fact that LES re-enforced its program by hiring a new program director does not show otherwise. This was Balut's first job at LES, a job different than the one he left when he was laid off. *See* Balut Dep. at 59, ¶¶ 23–25; *Johnson v. New York Med. College,* No. 95 Civ. 8413, 1997 WL 580708, at * 9 (S.D.N.Y. Sept.19, 1997).

Second, the fact that the ALQ–131 grew 444% in 1994, and has continued to prosper, does not mean that the program is not "being completed." Defendants nowhere state that the program was to be completed at any particular date, only that the program was "zeroing down." *See, e.g.,* Silverman Dep. at 63, ¶¶ 10–11. Even if this statement is untrue, just because a proffered reason is false, does not mean it is discriminatory. *See Hicks,* 509 U.S. at 515–16, 113 S.Ct. at 2751–52. It is uncontroverted that the ALQ–178 was being "phased out of production . . . in New York," and that Hallisy "was becoming

available" for the ALQ–131. Silverman Dep. at 63, ¶¶ 11–12; 65, ¶¶ 7–10.

Third, the fact that the ALQ–131 may have been fiscally healthy during 1994 does not mean that LES did not elsewhere feel financial strain. This is true, even if Loral's Chief Executive Officer stated in Loral's annual report that "[f]iscal 1994 was another spectacular year for Loral." Pl.'s Ex. P, at 5. First, this statement was not made by LES, but by Loral. Second, LES' decision to streamline its work force was a business judgment, and without more, is not pretextual. *See Scaria*, 117 F.3d at 654–55.

For example, in *Spence*, 803 F.Supp. at 669, plaintiff claimed that the financial success of his branch in the years immediately preceding his discharge, when he was manager, demonstrated pretext. The court concluded that plaintiff had failed to show pretext and granted summary judgment to the defendant: "Economic criteria and management skills are separate performance categories and [defendants] could have had concerns about one and not the other, still indicating a concern for job performance.... As such, this line of indirect evidence is insufficient to ... establish[] pretext." *Id.* at 669–70. The Court of Appeals affirmed. 995 F.2d 1147. As in *Spence*, where the plaintiff was discharged based on his performance, *id.* at 669, here, Balut was laid off for the stated reason that his job could be better performed by someone else. This Court will not second-guess this determination.

The Court understands Balut's fourth point to be that defendant LES has proffered "inconsistent" reasons for reducing the number of senior program managers. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. for S.J. and in Supp. of Pl.'s Mot. for S.J. at 27. An examination of the testimony cited reveals that this contention is "based largely on statements out of context, and on inapt comparisons between different statements." *Thomson v. Saatchi & Saatchi Holdings, Inc.*, 958 F.Supp. 808, 823 (W.D.N.Y.1997). For example, Balut claims that according to Browdy, LES "was heavy in program management and there was a draw down of the program, [and] you are no longer needed in

management." Balut Dep. at 50, ¶¶ 14–17. The statement that there was a "draw down" of "the program" is not inconsistent—and is certainly not entirely at odds—with Silverman's alleged comment, that the "178 program was phasing down ... and [Hallisy] could move over to the 131," or that "the 131 [is] ... [a] staple program[] that will run for many, many years ..." From Balut's testimony, it is unclear whether Browdy was referring to the senior management program or to the 131. Even if he were referring to the 131, just because something is running, does not mean that it is not "phasing down." Regardless, a defendant's mere inconsistency, without more, does not show pretext. *See Merrick*, 892 F.2d at 1438. *See also Fisher*, 114 F.3d at 1338–39 (mere falsity of explanation insufficient to show pretext).

Fifth, Balut's claim that defendants have "changed" their reasons for laying him off, and therefore their reasons are pretextual, is unconvincing. Considering the argument in light of what was actually said, it is clear that while defendants may have failed to document their reasons, they did not "change" these reasons nor did the reasons become "inconsistent," during the course of this litigation. That defendants waited to memorialize the reasons for Balut's layoff—the reduction in force, his lack of technical expertise—does not derogate the reasons themselves. As other courts have held, it "is not unusual" for an employer to document its reasons "in response" to a discrimination suit. *E.g., Merrick*, 892 F.2d at 1438.

The cases Balut cites are not to the contrary. For example, in *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir.1994), the Court of Appeals reversed the trial court's judgment as a matter of law in favor of defendant where plaintiff had introduced evidence that defendant had provided inconsistent explanations for its decision to lay him off. Balut fails to recognize, however, that in *Ethan Allen*, defendant had maintained at trial that it had "engaged in a thorough comparison of the merits" of the employees in question, but that in response to the earlier EEOC investigation, it had stated that "the *sole* reason for [the employee's] discharge was a decrease in the duties of his special projects position."

*Id.* (Emphasis added). The court further noted that one of the decision makers had previously denied that the employees' individual merits had been taken into account. *See id.* Finally, once the state investigation had begun, defendant had "cited ... performance· problems ... even though [it] had originally discounted performance as a determinative factor." *Id.*

In *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 39 (2d Cir.1994), the Court of Appeals reversed the district court order granting summary judgment to defendant where there was evidence that plaintiff's performance had never been questioned, while on their motion, defendants maintained that plaintiff was discharged for "performance [which] was so poor that he repeatedly [was] admonished."

This is not the case here. First, in this case, the state declined to pursue Balut's claims, so defendants were never given the opportunity to change their position between the time of an administrative investigation and the time of the lawsuit. Regardless, defendants never stated that there was a *sole* reason for laying Balut off. Despite Balut's allegations to the contrary, defendants have consistently contended that their reasons included a reduction in force and the managers' "overall abilities." *See, e .g.,* Balut Dep. at 32, ¶¶ 2–5; 39, ¶¶ 20–25; Pl.'s Ex. O at § C. Thus, it cannot be said that "the [legitimate,] nondiscriminatory purpose was stated only after" discrimination had been alleged. *See DeMarco v. Holy Cross High School,* 4 F.3d 166, 171 (2d Cir.1993). From the start, Balut knew that he was being laid off pursuant to the reduction in force. *See* Balut Dep. at 32, ¶¶ 2–5; 39, ¶¶ 20–25. ("[Browdy] said ... 'We are just letting people go and you are on the. list'....I knew that LES was having a layoff that day and that the people they were letting go were put on ... the list.") Additionally, Balut's reviews demonstrate that his work did not go without criticism. In the year immediately preceding his lay off, Browdy had informed Balut that he was not meeting "material issues" in his program. *See* Pl.'s Ex. C. These issues, in turn, had delayed delivery schedules and caused "end of run shortages." *Id.* There is also

evidence that Balut did not use his employees and inventory in the most effective manner. *Id.* Furthermore, unlike the situation in *Chambers,* defendants have not contended that Balut was discharged for poor performance per se, but rather that there was another employee who was better suited for the job.

We believe that this case is more like *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219–20 (3d Cir.1988) (cited with approval in *O'Connor v. Viacom Inc.,* No. 93 Civ. 2399, 1996 WL 194299, at *8 (S.D.N.Y. Apr.23, 1996)), than the cases Balut has cited. In *Healy,* the court declined to find pretext where plaintiff, who had performed competently, and had received favorable evaluations and promotions, had been laid off during a reduction in force, because another employee was simply more qualified. Though there were differences among the evaluations plaintiff had received while working and the evaluations made during litigation, the court concluded that these differences were "one[s] of degree rather than ... kind." *Id.* at 1220. Furthermore, the court reasoned that during a reduction in force, "competent employees who in more prosperous times would continue and flourish at a company may have to be fired." *Id.* At such times, the employer "has the right to make judgments on employee status, particularly when the decision involves subjective factors ... deem[ed] essential to high-level ... positions." *Id.* We conclude that in this case as well, the reviews made of Balut during his employment are consistent with those assessments made of him during the case at bar.

■ Finally, Balut misconstrues the law when he suggests that defendants must submit or cite evidence to "rebut" plaintiff's contentions. The plaintiff always bears the burden of showing pretext.· *Fisher,* 114 F.3d at 1336; *Quaratino,* 71 F.3d at 64. Additionally, on a motion for summary judgment, the Court considers the evidence as a whole, without regard to its source. This Court thus finds that defendants' proffered reasons were not pretextual, because plaintiff points to no material evidence suggesting otherwise.

Because Balut has failed to show sufficient evidence of pretext, and defendants have

proffered a legitimate, business reason for laying him off, we dismiss Balut's case. Although Balut may have offered direct evidence of age discrimination, "some evidence is not sufficient to withstand ... summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the [discriminatory factor] was the real reason for the [employer's actions]." *Woroski*, 31 F.3d at 110. Indeed, the solitary remark, ambiguous as it was, can hardly be said to create an issue of material fact which would preclude summary judgment for defendants in this case. *See Gagne*, 881 F.2d at 314. "Even if given its most incriminating ... construction the remark is simply 'too slender a reed to carry the weight of the charge in this case against the evidence which refutes it.'" *Graham v. Renbrook School*, 692 F.Supp. 102, 108 (D.Conn.1988) (citation omitted).

### IV. *Hitchen Affidavit*

■ Finally, Balut contends that the affidavits of Sarah Hitchen, former Manager of Compensation and Benefits at LES and Director of Human Resources at Lockheed Martin, should be stricken from the Record, because Hitchen lacks personal knowledge regarding the layoffs.

Contrary to Balut's assertions, Hitchen's affidavits are properly submitted. The affidavits establish that as Manager of Compensation and Benefits, Hitchen possesses personal knowledge with regard to at least some of the facts, and as to those she did not, Hitchen declares that as Director of Human Resources she has reviewed the files in her possession and control. *See* Hitchen Affs., 6/26/97, ¶ 4; 8/29/97, ¶ 4. This is all the law requires. *See* FED. R. CIV. P. 56(e). *See also Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 576, 581 (2d Cir.1993) (affirming denial of motion to strike where affidavit based upon personal knowledge, "perceptions" and business records); *Fitzpatrick v. Duquesne Light Co.*, 601 F.Supp. 160, 162 (W.D.Pa.), *aff'd*, 779 F.2d 42 (3d Cir.1985) (declining to strike where affiant, as human resources su-

pervisor, could "appropriately identify business documents" and "must use" personnel records "in the performance of his duties"). Regardless, defendants have submitted sufficient evidence to rebut Balut's prima facie case, without taking Hitchen's affidavits into account. Accordingly, we need not address plaintiff's final point, that evidence of any layoffs made after Balut left LES should be stricken as irrelevant.

### CONCLUSION

Because plaintiff lacks a prima facie case, or alternatively, because defendants have proffered legitimate, non-discriminatory reasons for discharging plaintiff, plaintiff has failed to state a claim for age discrimination under the ADEA. Accordingly, his action is dismissed.

SO ORDERED.