Weishao "Sherry" **MENG**, Plaintiff,

v.

**IPANEMA SHOE CORPORATION and Sumitomo Corporation of America, Defendants.**

**No. 98 Civ. 6790(SAS).**

United States District Court, S.D. New York.

Sept. 15, 1999.

bankruptcy filing.

---

**3.** The Court has already stated that International cannot be held liable by virtue if its

Steven A. Rosen, New York City, for plaintiff.

Christopher A. Parlo, Rene M. Johnson, Morgan, Lewis & Bockius LLP, New York City, for defendants.

## OPINION & ORDER

SCHEINDLIN, District Judge.

Plaintiff Weishao "Sherry" Meng ("plaintiff" or "Meng") brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") alleging wrongful termination based on her race/national origin (Chinese) and quid pro quo and hostile work environment sexual harassment. Plaintiff also alleges claims under the New York State Human Rights Law, N.Y. Executive Law § 290, *et seq.,* the New York City Human Rights Law, N.Y.C. Administrative Code § 8–107, *et seq.,* and New York common law. She has sued both her immediate employer, Ipanema Shoe Corporation ("Ipanema"), and Ipanema's parent corporation, Sumitomo Corporation of America ("Sumitomo") (collectively, "defendants").

Defendants have moved for partial summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure on the following grounds:[1] (1) that plaintiff's wrongful termination claim must be dismissed because plaintiff has not provided sufficient proof that her termination was based on unlawful discrimination; (2) that plaintiff's pay raise and promotion claims

are untimely and must be dismissed; and (3) that defendants are insulated from liability on plaintiff's hostile work environment claim under the *Faragher/Ellerth* affirmative defense; and (4) that Sumitomo must be dismissed because Ipanema and Sumitomo cannot be considered a single employer for purposes of Title VII. For reasons to follow, defendants' motion is granted in part and denied in part.

## Discussion

### A. Summary Judgment Standard

Federal Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Therefore, the moving party has the initial burden of demonstrating the absence of a material factual issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must review the opposing evidence in a light most favorable to the non-moving party and draw all factual inferences in that party's favor. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial" to defeat the motion. Fed.R.Civ.P. 56(e). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505. At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

---

**1.** Except for the issue of the *Faragher/Ellerth* affirmative defense, defendants have not moved for summary judgment on plaintiff's sexual harassment claims.

A Title VII plaintiff cannot defeat summary judgment by asserting conclusory allegations of discrimination unsupported by evidence. *Kerzer,* 156 F.3d at 400 (citing *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)) (conclusory allegations, conjecture and speculation are insufficient to create a genuine issue of material fact).

Summary judgment should be used cautiously in employment discrimination cases "where, as here, the employer's intent is at issue." *Kerzer,* 156 F.3d at 400 (citing *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994)); *Smith v. American Express Co.,* 853 F.2d 151, 154 (2d Cir.1988) ("summary judgment is ordinarily inappropriate in a Title VII action where a plaintiff has presented a prima facie case"). Nevertheless, a plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor, . . . and is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (internal quotations omitted). Indeed, the "summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive, and harassing trials—apply no less to discrimination cases that to commercial or other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). This is particularly so where discovery has taken place. *Dister,* 859 F.2d at 1114.

## B. Plaintiff's Wrongful Termination Claim

### 1. Plaintiff's Prima Facie Case

Plaintiff began working for Ipanema in April 1995 and became a customer service representative shortly thereafter. *See* Revised Affidavit of Rene M. Johnson (defendants' attorney) in Support of Defendants' Motion for Summary Judgment, sworn to on July 16, 1999 ("Johnson Aff.") Ex. B at 12, 23 [Deposition of Weishao Meng]. Ipanema is in the business of selling shoes by placing customer orders directly with shoe manufacturers and by acting as agents for customers. Revised Affidavit of Seiji Itoshima, sworn to on July 16, 1999 ("Itoshima Aff.") ¶¶ 27, 28 In 1997, Ipanema's financial performance was poor. *Id.* ¶ 51. As a result, in early 1998, Ipanema decided to reduce its workforce as part of a plan to cut costs. *Id.* ¶¶ 52, 57, 59. In February 1998, Mr. Itoshima, Ipanema's Executive Vice President and Treasurer, met with the heads of Ipanema's various departments and informed them of the intended reduction in workforce. *Id.* ¶ 58. At that time, Josef Zajdel, Vice President—Marketing Services, was in charge of the customer service department where plaintiff worked. Mr. Itoshima asked Mr. Zajdel which customer service representatives could be laid off. *Id.* Mr. Zadjel then discussed whom to lay off with Maria Acevedo, the General Manager of Customer Service. *Id.* ¶ 60. Shortly thereafter, Mr. Zajdel and Ms. Acevedo selected Ms. Meng as one of the employees to be terminated. *Id.* ¶ 62.

According to Mr. Itoshima, Ipanema chose those "individuals whose positions were not essential or duplicative. [Ipanema] tried to select those individuals whose departures would have the least effect on Ipanema's day to day activities, and whose workloads could be absorbed by remaining employees." *Id.* ¶ 64. Seniority was not considered. *Id.* ¶ 65. On March 31, 1998, Ms. Meng was laid off, *id.* ¶ 70, primarily because her work could be easily absorbed by Ms. Acevedo.[2] *Id.* ¶ 73.

Ms. Meng was one of seven employees laid off between February and April 1998.

---

**2.** Ms. Acevedo had handled plaintiff's accounts when plaintiff first started with Ipanema and more recently when she was on a one month vacation in China in January 1998.

Defendants' Revised Local Civil Rule 56.1 Statement of Material Facts in Support of Their Motion for Summary Judgment ("Def. R. 56") ¶ 133.

Def.R.56 ¶ 108. Of the remaining employees terminated, three were members of racial or ethnic minorities (a black Cuban woman, an Asian man, and a Puerto Rican/Hispanic woman). Affidavit of Weishao "Sherry" Ming, sworn to on July 27, 1999 ("Meng Aff.") ¶ 13. The other three were Caucasian (two men and one woman). *Id.;* Def.R.56 ¶ 152. After the layoffs, four Asian women, including one Chinese woman, and one Asian man remained at Ipanema. Def.R.56 ¶ 158. Ipanema had twenty-six employees after the layoff. *Id.* ¶ 157.

Plaintiff claims that she was not laid off for legitimate business reasons but that she was discriminated against because she is Chinese. Meng Aff. ¶¶ 14–16. In support of this claim, she points to the deposition testimony of Josef Zajdel. During his deposition, Mr. Zajdel was questioned about Ms. Meng's ability to handle the receptionist function.[3] Declaration of Steven A. Rosen (plaintiff's attorney), sworn to on July 28, 1999 ("Rosen Decl.") Ex. 3 at 125 [Deposition of Josef Zajdel]. In response, he stated that some of Ms. Meng's customers had difficulty understanding her at times. *Id.* at 126. He also stated that it was not an "earth-shattering problem" and that to the best of his recollection the complaints were, in all likelihood, lodged more than a year before plaintiff's termination. *Id.* 126–27. Consistent with his deposition testimony, Mr. Zajdel later stated that "contrary to Ms. Meng's allegations, her accent played no part in my decision, made in connection with Maria Acevedo, to select Ms. Meng for layoff." Zajdel Aff. ¶ 14.

### 2. Legal Framework

■■■ The analytical framework for considering claims alleging wrongful termination under Title VII is well-established.[4] *See Texas Dep't of Community*

Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must present a prima facie case of discrimination. An employee discharged in connection with a reduction in force need not show that she was replaced by someone not in a protected class. *Montana v. First Federal Sav. and Loan Ass'n of Rochester,* 869 F.2d 100, 104–05 (2d Cir.1989). Rather, as part of her prima facie case, she must show: (1) that she was a member of a protected class; (2) that she was qualified for the position; (3) that she was discharged; and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination. *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994). "If the plaintiff demonstrates a prima facie case, a presumption of discrimination arises and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff." *Balut v. Loral Elec. Systems,* 988 F.Supp. 339, 348 (S.D.N.Y.1997), *aff'd mem.,* 166 F.3d 1199 (2d Cir.1998) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). An employer " 'need not persuade the court that it was actually motivated by the proffered reasons' in order to nullify the presumption and obligate the plaintiff to satisfy the burden of proof." *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089). If the employer satisfies this burden, the presumption of discrimination "simply drops out of the picture." *Hicks,* 509 U.S. at 510, 113 S.Ct. 2742. Then the plaintiff may only prevail if she can show by a preponderance of the evidence that the employer's stated reasons are pretextual. *Fisher,* 114 F.3d

---

3. The ability to perform receptionist duties apparently became an issue because Ipanema decided not to replace its receptionist but rather assign her duties to one of the remaining employees. *See* Affidavit of Josef Zajdel, sworn to on August 5, 1999 ("Zajdel Aff.") ¶ 9.

4. As claims under New York state and city anti-discrimination laws require the same proof as claims under Title VII, the following analysis is also applicable to plaintiff's state and local claims. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998).

at 1339. "A plaintiff does not win merely by proving the asserted reason to be false; rather, an employer's proffered reason must be false and its real reason unlawful." *Balut,* 988 F.Supp. at 348 (citing *Hicks,* 509 U.S. at 515–16, 113 S.Ct. 2742; *Fisher,* 114 F.3d at 1338–39).

In short, once an "employer has produced evidence of a non-discriminatory rationale for its actions, 'the factual inquiry proceeds to a new level of specificity.' " *Viola v. Philips Medical Sys. of North America,* 42 F.3d 712, 717 (2d Cir.1994) (quoting *Hicks,* 509 U.S. at 516, 113 S.Ct. 2742) (summary judgment in employer's favor affirmed where employee failed to present sufficient proof that employer's justification for discharge was pretextual). Accordingly, to "defeat a properly supported motion for summary judgment, plaintiff must 'produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more than likely the employee's [race] was the real reason for discharge.' " *Id.* (quoting *Woroski,* 31 F.3d at 110).

### 3. Analysis

■ Here, plaintiff has presented the elements of a prima facie case. First, it is undisputed that she is a member of a protected class being an Asian woman. Second, she has shown that she was qualified for the position she held in the customer service department. *See* Plaintiff's Statement of Material Facts in Issue Pursuant to Local Rule 56.1 ("Pl.R.56") ¶ 245 (plaintiff's supervisor, Maria Acevedo, stated that she had no problems with plaintiff's performance on the job). The fact that plaintiff was discharged is uncontested. Plaintiff has also shown that her discharge was under circumstances giving rise to an inference of discrimination. Several factors give rise to such an inference. One is the fact that out of seven employees terminated, four were minorities. Second is the possibility that plaintiff's Chinese accent may have played a part in Ipanema's decision to select her for termination. *See Carino v. University of*

*Oklahoma Bd. of Regents,* 750 F.2d 815, 819 (10th Cir.1984) ("A foreign accent that does not interfere with a Title VII claimant's ability to perform duties of the position [she] has been denied is not a legitimate justification for adverse employment decisions.") Lastly, and most important, is the fact that within a year of plaintiff's termination, Ipanema hired two new employees in their customer service department, at least one of whom is Caucasian. *See* Rosen Decl. Ex. 2 at 331; Ex. 3 at 167, 170. "The decision to hire replacement employees following a general reduction in the work force may, in conjunction with other evidence, establish an inference of an improper motive." *Viola,* 42 F.3d at 718 (citation omitted). This evidences, in total, is slightly more than speculative and satisfies plaintiff's prima facie case. *See Fisher,* 114 F.3d at 1335 (burden of establishing a prima facie case is not onerous) (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

■ Defendants, however, have come forward with a legitimate, nondiscriminatory reason for their actions in discharging plaintiff—namely, a general reduction in force at Ipanema. Courts in this circuit have generally recognized reduction-in-force as sufficient evidence to rebut plaintiff's prima facie showing. *See, e.g., Viola,* 42 F.3d at 717 (employer "implemented a business-justified, company-wide reduction in force in response to changes in business emphasis and economic necessities"); *Balut,* 988 F.Supp. at 349 (summary judgment affirmed where plaintiff failed to produce sufficient evidence that he was terminated because of his age—plaintiff was laid off pursuant to general reduction in workforce based purely on business concerns); *Brown v. Manufacturers Hanover Trust Co.,* 92 Civ. 4732, 1993 WL 138823 (S.D.N.Y. Apr.23, 1993) (summary judgment granted in bank's favor where no reasonable jury could find that bank's reduction in force was merely a pretext for race discrimination).

Not only have the defendants offered a legitimate, nondiscriminatory reason for plaintiff's termination, they have offered reasons why plaintiff was chosen over two other employees, Gina Caro and Jessica Capedevilla, whom plaintiff has identified as two employees who should have been laid off instead of her. Ms. Cara, a black Hispanic woman, was retained because she had been a receptionist at Ipanema and would be able to handle the receptionist duties without additional training. Def. R.56 ¶ 136. Ms. Capedevilla, a white woman, was retained because she had recently begun handling Ipanema's Canadian customers and was performing well. *Id.* ¶ 137. It is not the function of this Court to second-guess an employer's business decisions. *See Dister,* 859 F.2d at 1116 ("Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as the credibility of the employer's reasons."); *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir.1987) ("A reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination."). Furthermore, Ipanema was entitled to retain other employees who, in its view, were more qualified or better suited to the company's goals than plaintiff. *See Brown,* 1993 WL 138823, at *4.

Plaintiff's evidence, which arguably gives rise to an inference of discrimination, simply does not carry her burden in showing that defendants' stated reason is a pretext and that race/national origin discrimination was the real reason for her termination. The fact that four out of seven of the terminated employees were minorities is of little concern especially since four Asian employees remained at Ipanema after the layoffs. *See Brown,* 1993 WL 138823, at *4 (fact that a white woman was retained rather than plaintiff, a black woman, does not, without more, "demonstrate a discriminatory intent, par-

ticularly since other black employees remained in the department"). And as to the hiring of two new employees after plaintiff's discharge, Pat Flaminio[5] testified at his deposition that the reason for hiring one of them was due to Gina Caro's resignation. Rosen Decl. Ex. 2 at 334. In any event, the fact that Ipanema hired two new employees within a year of Meng's termination does not, in and of itself, "cast any doubt on the economic necessity of the original termination decision." *Viola,* 42 F.3d at 718. Lastly, plaintiff's allegation that she was fired because of her Chinese accent is also unavailing. Josef Zajdel did not state that it was plaintiff's Chinese accent that caused her communication problems, he merely said that some of her customers had trouble understanding her. Even assuming, *arguendo,* that he was speaking of plaintiff's accent, this is not sufficient to defeat summary judgment. As the Ninth Circuit has explained:

> An adverse employment decision may be predicated upon an individual's accent when—but only when—it interferes materially with job performance. There is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance.

*Fragante v. City and County of Honolulu,* 888 F.2d 591, 596–97 (9th Cir.1989). *See also Mejia v. New York Sheraton Hotel,* 459 F.Supp. 375, 376 (S.D.N.Y.1978) (reason plaintiff was not promoted to front office cashier position was due to her inability to make herself adequately understood in English). Here, it cannot be disputed that part of Ms. Meng's functions were to communicate with customers. Ipanema could, therefore, permissibly consider her communication skills in deciding which employees to let go. Accordingly, plaintiff's wrongful termination claim based on race/national origin, both under

---

**5.** Pat Flaminio has been Ipanema's President and Chief Operating Officer since August 1, 1997. Def.R.56 ¶ 8.

Title VII and New York law, are dismissed.

### C. Plaintiff's Pay Raise and Promotion Claims

Plaintiff's starting annual salary was $29,000. Def.R.56 ¶ 70. Plaintiff received year-end raises each year she worked at Ipanema resulting in an annual salary of $32,683 at the time she was terminated. *Id.* ¶ 71. Plaintiff alleges, however, that she was denied a raise in the summer of 1995 which was discriminatory in nature because "all the white girls got them." *Id.* ¶¶ 72, 73.

On October 31, 1996, plaintiff sent a memorandum to Mr. Shinozaki, one of Ipanema's Senior Vice Presidents, requesting a promotion to a position called "Coordinator, Linebuilding/Merchandising." *Id.* ¶ 86. Defendants contend that the position was re-structured after the employee in that position left the company. *Id.* ¶ 88. Regardless of the reason, plaintiff was denied the promotion on November 14, 1996. *Id.* ¶ 92.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 26, 1998. *Id.* ¶ 17. The complaint in this action was filed on September 25, 1998. *Id.* ¶ 18. In order to maintain a federal court action under Title VII, a plaintiff must file a charge with the EEOC within 300 days of the alleged discriminatory action.[6] 42 U.S.C. § 2000e–5(e)(1). *See also Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). Thus, any claims relating to acts that occurred prior to July 30, 1997 would be untimely. Accordingly, plaintiff's Title VII claims for denial of a pay raise in 1995 and a promotion in 1996 are untimely and must be dismissed. Similarly, her pay raise claim is also untimely under New York state and city law and must be dismissed. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d

898, 907 (2d Cir.1997) (complaint must be filed within three years of the alleged act under New York state and city law) (citations omitted). Plaintiff's failure to promote claim, under New York law, is not barred by the three-year statute of limitations. This Court will therefore exercise its supplemental jurisdiction over this claim and let it proceed to trial.

### D. The *Faragher/Ellerth* Defense

During the entire tenure of plaintiff's employment, Ipanema had a sexual harassment prevention policy in place, contained in its Employee Handbook which, according to Ipanema, is distributed to all new employees. Itoshima Aff. ¶¶ 40–42. Prior to its revision in September 1996, the policy stated:

> The Company will not tolerate sexual harassment of or by employees, customers or visitors. It is both illegal and against Company policy for any employee, male or female, whether manager, supervisor, or employee, to engage in sexual harassment, whether verbal, physical or visual. Employees at all levels are prohibited from subjecting employees or prospective employees to sexual advances, slurs or any other form of sexual harassment. Every employee has a responsibility and obligation to conduct him or herself consistent with this policy and failure to do so will be subject to disciplinary action up to and including termination.

Johnson Aff. Ex. K at 18. Prior to September 1996, the policy directed employees subjected to perceived harassment to report the conduct to Ipanema's Chief Administration Officer or Auriel Gonzalez, Assistant Vice President. *Id.* After its revision, the policy urged employees to report any inappropriate conduct to Auriel Gonzalez or the employee's direct supervi-

---

**6.** Pursuant to 42 U.S.C. § 2000e–5, a charge of discrimination must be filed with the EEOC within either 180 or 300 days of the alleged unlawful employment practice, the latter being applicable where the claimant has instituted proceedings with a state or local equal employment agency. It is of little significance as to which time limit is applied as these claims would still be time-barred under the more generous 300 day time limit.

sor. Itoshima Aff. Ex. B at 14. The basic policy statement regarding sexual harassment remained unchanged. *Id.* On September 4, 1996, Ipanema held a sexual harassment seminar which plaintiff attended. Affidavit of Christopher P. Reynolds, partner in the law firm of Morgan, Lewis & Bockius, defendants' attorneys, sworn to on July 6, 1999 ("Reynolds Aff."), ¶ 10, Meng Aff. ¶ 28.

Defendants contend that they are insulated from liability for plaintiff's hostile work environment sexual harassment claims under the so-called *Faragher/Ellerth* affirmative defense. In the twin cases of *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court held that where no adverse employment action is taken, there may be an affirmative defense to liability.

> The defense comprises two necessary elements: (a) that the employer exercised *reasonable* care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee *unreasonably* failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher,* 524 U.S. at ——, 118 S.Ct. at 2293; *Ellerth,* 524 U.S. at ——, 118 S.Ct. at 2270 (emphasis added). This defense is not available, however, in cases involving quid pro quo harassment. *Id.* 118 S.Ct. at 2259; *id.* at 2261.

■ There are a number of problems in applying this affirmative defense in the summary judgment context presented here. First, there is both the timing and circumstances under which plaintiff received the Employee Handbook and, hence, notice of the policy. Plaintiff states that she was not given a copy of the Employee Handbook when she began working for Ipanema. Meng Aff. ¶ 26. Furthermore, nobody at Ipanema informed her of Ipanema's sexual harassment prevention policy. *Id.* It was not until sometime in 1997 that plaintiff received a copy of the handbook from Mr. Shinozaki, a senior vice president at Ipanema, in response to a question plaintiff had about Ipanema's sick leave policy. *Id.* Plaintiff claims that she read the sick leave provisions of the handbook but did not read the rest of it until after her termination. *Id.* Similarly, plaintiff claims that she was not informed of Ipanema's sexual harassment policy during the September 1996 seminar. *Id.* ¶ 28. Although she recalls that the seminar discussed the types of conduct that would not be permitted, she was not given a copy of such policy nor was she told by anyone to report incidents of harassment. *Id.*

Plaintiff's testimony presents a material question of fact as to whether Ipanema's actions in preventing sexual harassment were reasonable. It is one thing to have a stated sexual harassment policy but it is another to distribute that policy to employees in a timely manner. *See Faragher,* 524 U.S. at ——, 118 S.Ct. at 2293 (employer failed to exercise reasonable care to prevent sexual harassment by failing to disseminate its policy against sexual harassment). Whether Ipanema's actions were reasonable in this regard is a factual decision best left for the jury.

■ Then there is the supervisory status of the alleged perpetrators. Plaintiff alleges various forms of misconduct by three people at Ipanema: Pat Flaminio, Ipanema's Chief Operating Officer; Don Melof, a Senior Vice President; and Albert Pearce, a salesman. Meng. Aff. Ex. A ¶¶ 17–35. Although Flaminio was arguably plaintiff's supervisor, there is a question as to the supervisory status of Melof and Pearce. Should a jury find that Melof and/or Pearce were plaintiff's co-workers, not supervisors, a different standard for co-worker liability would apply. *Richardson v. New York State Dept. of Correctional Service,* 180 F.3d 426, 440 (2d Cir.1999) (*Faragher/Ellerth* did not change the liability principles applicable to co-worker harassment). In order to impute liability to Ipanema for a co-worker's actions, a

plaintiff must show that the employer either: (1) provided no reasonable avenue for complaint or (2) knew of the harassment but did nothing about it. *Id.* (citing *Murray v. New York University*, 57 F.3d 243, 249 (2d Cir.1995)). Here, there is a factual dispute as to Ipanema's knowledge of the alleged harassment. During her deposition, plaintiff stated that Mr. Shinozaki observed Albert Pearce kick her behind. Rosen Decl. Ex. 1 at 214–15. This dispute is best resolved by the jury. In any event, the *Faragher/Ellerth* defense would not apply to plaintiff's claims of co-worker harassment or her claims of quid pro quo harassment. Moreover, there is a question as to whether it would apply given the high-ranking status of the officers involved and their threats to fire plaintiff if she told anyone of their actions. *See Caridad v. Metro–North Commuter Railroad*, 191 F.3d 283, 295 (2d Cir.1999) (employee's reluctance to report acts of workplace harassment may preclude employer's affirmative defense if based on apprehension of what the employer might do); *Cf. Fierro v. Saks Fifth Avenue*, 13 F.Supp.2d 481, 492 (S.D.N.Y.1998) (conclusory assertions of generalized fear of repercussions do not constitute reasonable grounds for an employee's failure to complain). It is for a jury, not this Court, to determine whether plaintiff's failure to report the various incidents of harassment was unreasonable given her arguably justifiable fear of reprisal from several of the employer's top-ranking officials.

### E. Sumitomo's Status as Employer Under Title VII

 Under the doctrine of limited liability, a corporation is permitted to organize "so as to isolate liabilities among separate entities." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir.1996) (citing *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir.1993)). Accordingly, a corporation will be liable for the acts of a separate, related corporate entity only under extraordinary circumstances. *Id.* The exception to this rule, known as the single employer doctrine, is only appropriate where there is " 'sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer.' " *Herman v. Blockbuster Entertainment Group*, 18 F.Supp.2d 304, 308 (S.D.N.Y.1998), *aff'd mem.*, 182 F.3d 899 (2d Cir.1999) (quoting *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir.1983)).

 In *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995), the Second Circuit adopted a four-part test "aimed at determining the degree of interrelationship between the two entities." Under that test, a "parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* (citing *Armbruster*, 711 F.2d at 1337). The critical question, according to the court, is: " 'What entity made the final decisions regarding employment matters related to the person claiming discrimination?' " *Id.* (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983)). A plaintiff "need not show that each factor exists in order to establish an integrated enterprise, nor is there one factor a plaintiff must show." *Regan v. In the Heat of the Nite, Inc.*, 93 Civ. 862, 1995 WL 413249, at *3 (S.D.N.Y. July 12, 1995) (citing *Armbruster*, 711 F.2d at 1337–38). In analyzing these factors, however, courts should focus on the second factor: centralized control of labor relations. *Herman*, 18 F.Supp.2d at 309.

This Court has reviewed the following items to determine whether a sufficient interrelation of operation exists:

(1) whether the parent was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) whether the

two entities shared employees, services, records and equipment; (3) whether the entities commingled bank accounts, accounts receivable, inventories, and credit lines; (4) whether the parent maintained the subsidiary's books; (5) whether the parent issued the subsidiary's paychecks; and (6) whether the parent prepared and filed the subsidiary's tax returns.

*Herman,* 18 F.Supp.2d at 309 (citing *Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 778 (5th Cir.1997)).

■■■ With regard to control over labor relations, relevant factors include whether the subsidiary has a separate human resource department and whether it "establishes its own policies and makes it own decisions as to the hiring, discipline, and termination of its employees." *Duffy v. Drake Beam Morin, Harcourt General, Inc.,* 96 Civ. 5606, 1998 WL 252063, at \*4 (S.D.N.Y. May 19, 1998). Also relevant is whether employment applications are sent to the parent, whether personnel status reports are approved by the parent, whether the subsidiary must clear all major employment decisions with the parent, *Cook,* 69 F.3d at 1241, and whether the parent routinely shifts employees between the two companies. *Johnson v. Flowers Industries, Inc.,* 814 F.2d 978, 981 (4th Cir.1987).

The remaining prongs, common management and ownership, are less important as they represent ordinary aspects of the parent-subsidiary relationship. *Lusk,* 129 F.3d at 778. As the Fifth Circuit aptly explained:

> A parent corporation's possession of a controlling interest in a subsidiary entitles the parent to the normal incidents of stock ownership, such as the right to select directors and set general policies, without forfeiting the protection of limited liability. Thus, courts have recognized that the mere existence of common management and ownership are not sufficient to justify treating a parent corporation and its subsidiary as a single employer.

*Id.*

■■■ Here, plaintiff has offered little evidence of interrelation of operations or centralized control over labor relations between Ipanema and Sumitomo. She has alleged that while she worked at Ipanema, it was managed by Sumitomo employees, namely Shoji Takiguchi, Nobuhiro Shinozaki and Seiji Itoshima, who were, in effect, loaned to Ipanema. *See* Meng Aff. ¶ 3. Mr. Takiguchi was president of Ipanema from the time of plaintiff's arrival in 1995 through 1997, while Mr. Shinozaki was Ipanema's Senior Vice President—Administration and Finance. *Id.* Mr. Itoshima replaced Mr. Shinozaki, holding the title of Executive Vice President—Administration and Treasurer. *Id.* According to plaintiff, all major decisions, particularly personnel decisions, were made or approved by these Sumitomo employees. *Id.* Defendants, however, refute this contention.

In his revised affidavit, Mr. Itoshima stated that while he remains on Sumitomo's payroll after he transferred to Ipanema,[7] Ipanema reimburses Sumitomo for the cost of his salary and benefits.[8] Itoshima Aff. ¶ 7. Furthermore, as Ipanema's Executive Vice President and Treasurer, his duty is to act in the best interests of Ipanema. *Id.* ¶ 8. Mr. Itoshima's only office is maintained at Ipanema and he has only reported to Ipanema's president, Pat

---

7. According to an undisputed allegation in Defendants' Revised Local Civil Rule 56.1 Statement of Material Facts in Support of Their Motion for Summary Judgment ("Def.R.56"), Seiji Itoshima joined Ipanema on July 10, 1997. Def.R.56 ¶ 9.

8. Mr. Shinozaki testified at deposition that his the combined amount of his salary and bene-

fits was reimbursed by Ipanema to Sumitomo according to a management fee arrangement. The salary and benefits of Mr. Takiguchi were similarly reimbursed. *See* Revised Affidavit of Rene M. Johnson (defendants' attorney) in Support of Defendants' Motion for Summary Judgment, sworn to on July 16, 1999 ("Johnson Aff.") Ex. G at 16—17 [Oral Deposition of Nobuhiro Shinozaki].

Flaminio. *Id.* ¶¶ 9, 10. His only regular contact with Sumitomo involves the reporting of Ipanema's financial performance and its semiannual budget. *Id.* ¶ 11.

According to Mr. Itoshima, Sumitomo is not involved in the day-to-day operations of Ipanema. *Id.* ¶ 18. Ipanema and Sumitomo do not share bank accounts or commingle funds. They do not share advertising, marketing, shipping or distribution functions. Nor do they share payroll or accounting functions. *Id.* ¶ 22. Moreover, Sumitomo and Ipanema have distinct management structures whereby daily decisions concerning Ipanema are made by Mr. Itoshima, Pat Flaminio and other Ipanema managers. *Id.* ¶¶ 19–20. Mr. Itoshima further stated that Sumitomo had no involvement in plaintiff's wages, raises, employment conditions or termination. *Id.* ¶ 21. Sumitomo's approval of Ipanema's decision to lay off employees was neither required nor sought. *Id.* ¶¶ 56, 83.

Certain decisions regarding personnel had to be approved by Sumitomo. Such decisions included salary changes for Ipanema vice presidents and senior vice presidents and the level of compensation for outside salespeople. *See* Rosen Decl. Ex. 5 at 54, 78 [Oral Deposition of Nobuhir Shinozaki]. However, the lion's share of personnel decisions affecting plaintiff's employment were made by Mr. Takiguchi. It was Mr. Takiguchi who approved all hiring decisions at Ipanema. *See* Rosen Decl. Ex. 2 at 158 [Deposition of Pat Flaminio]. Mr. Takiguchi also decided on promotions and raises for employees in the customer service department where plaintiff worked. *See* Rosen Decl. Ex. 5 at 18–19. Mr. Takiguchi made these decisions on his own without the approval of Sumitomo. *Id.* at 19.

Although it is clear that the Sumitomo employees loaned to Ipanema (Takiguchi, Shinozaki and Itoshima) did in fact control many, if not all, of the aspects of plaintiff's employment, there is no evidence that these officers acted for or on behalf of Sumitomo in any capacity other than as Ipanema officers or that Sumitomo controlled Ipanema through their actions. This situation is similar to the one presented in *Lusk.* In *Lusk,* FoxMeyer Drug was a wholly-owned subsidiary of FoxMeyer Corporation which, in turn, was a wholly-owned subsidiary of National Intergroup, Inc. ("NII"). 129 F.3d at 775. Three individuals, Anderson, Butler, and Estrin, served as officers of all three corporations. *Id.* The plaintiffs, employees of FoxMeyer Drug who were terminated as a result of a reduction-in-force ("RIF"), attempted to sue NII on a single employer theory. *Id.* They alleged that "because these three individuals held positions at the highest level of NII's corporate structure, their involvement in the RIF plan may be imputed to NII." *Id.* at 779. The court rejected this argument, stating as follows:

> Circumstances surrounding the development and execution of the RIF plan show nothing more than that Anderson, Butler, and Estrin were acting as officers of FoxMeyer Drug and FoxMeyer Corporation. . . .
>
> [T]he [plaintiffs] point us to no evidence that these three ever sought approval from or even consulted anyone else in the NII organization. . . .
>
> Thus, the record supports only the inference that, while involved in the RIF plan, Anderson, Butler, and Estrin, were acting in their capacities as directors and officers of the FoxMeyer subsidiaries, not NII . . .
>
> [T]he absence of evidence from which we may reasonably infer that Anderson, Butler, and Estrin were acting on NII's behalf dooms the [plaintiff's] argument for single employer status in this case.

*Id.* at 780–81.

Here, as in *Lusk,* there is a complete absence of any evidence in support of the proposition that the actions of Takeguchi, Shinozaki and Itoshima were part of a clandestine effort on the part of Sumitomo to control Ipanema. This failure of proof is fatal to plaintiff's claim that Sumitomo should be held liable on a single employer theory. Moreover, the duration of these

officers' employment at Ipanema counsels against a finding of interrelated operations. *See Herman,* 18 F.Supp.2d at 310 ("Nor does the one-time transfer of employees from Blockbuster [parent] to Discovery Zone [subsidiary] support a finding of integrated operations ... [A]fter the transfer, the employees were entirely dedicated to Discovery Zone and no longer affiliated with Blockbuster ... There is no evidence that employees otherwise rotated between the two companies."); *Balut,* 988 F.Supp. at 346 ("employees, if transferred, were transferred among subsidiaries 'annually,' and not on a day-to-day basis").

Plaintiff does point to other factors in support of her single employer theory. Plaintiff did receive her medical, life, and disability insurance and retirement benefits from Sumitomo. Meng Aff. ¶ 4. Throughout the course of her employment she received numerous documents from Sumitomo relating to her benefits, many of which identified her as a member of Sumitomo's group plans. *Id.* However, a "common benefits package speaks only to economies of scale ... and not to centralized control of labor relations." *Kellett v. Glaxo Enterprises, Inc.,* 91 Civ. 6237, 1994 WL 669975, at *5 (S.D.N.Y. Nov. 30, 1994). *See also Duffy v. Drake Beam Morin,* 1998 WL 252063, at *5 ("[T]hat Harcourt General administers the pension and benefit plans for its subsidiaries, including DBM, is hardly uncommon, nor is it proof that Harcourt General made the employment decisions at issue here.") (citations omitted); *Richard v. Bell Atlantic Corp.,* 946 F.Supp. 54, 62–63 (D.D.C.1996) (fact that parent administers pension and benefit plans for its subsidiary is of "low or no

probative value" in determining single employer status).

 In short, plaintiff has failed to produce sufficient evidence of the interrelation of corporate operations or centralized control by Sumitomo over labor relations at Ipanema. Thus, Sumitomo's motion for summary judgment is granted. *See Kellett,* 1994 WL 669975, at *5 (plaintiff's allegations including, *inter alia,* a common benefits package and central control of bonuses and salaries, found to be trivial in determining single employer status). Accordingly, defendant Sumitomo is hereby dismissed from this action.[9]

## Conclusion

For the foregoing reasons, plaintiff's wrongful termination and pay raise claims are dismissed under both Title VII and New York state and city law. Plaintiff's promotion claim, although barred for Title VII purposes, may proceed under state and local law. Regarding the *Faragher/Ellerth* defense, I find that whether plaintiff unreasonably failed to avail herself of Ipanema's preventive/corrective opportunities under the circumstances is a jury question that cannot be decided on summary judgment. Accordingly, plaintiff's sexual harassment claims for both quid pro quo and hostile work environment will proceed to trial. Finally, plaintiff has failed to present sufficient evidence to justify treating Sumitomo and Ipanema as a single employer. Sumitomo is therefore dismissed from this action entirely. A conference is scheduled for September 17, 1999 at 4:00 p.m. The joint pretrial order is

---

9. Sumitomo cannot be considered plaintiff's employer under the Human Rights Law either. In making this determination, a Court must consider the following:

"(1) whether the proposed employer had the power of selection and engagement of the employee;

(2) whether the proposed employer made the payment of salary or wages to the employee;

(3) whether the proposed employer had the power of dismissal over the employee; and

(4) whether the proposed employer had the power to control the employee's conduct."

*Alie v. NYNEX Corp.,* 158 F.R.D. 239, 246 (E.D.N.Y.1994). Because none of the above indicia are present here, Sumitomo is dismissed as to plaintiff's state and local claims as well as her Title VII claims.

due September 27, 1999 and the trial is scheduled for October 4, 1999 at 10:00 a.m.