**Wendy FRANK, Plaintiff,**

v.

**PLAZA CONSTRUCTION CORPORATION, et al., Defendants.**

**No. 00 CIV 6111 LAK.**

United States District Court, S.D. New York.

Feb. 21, 2002.

Davis S. Ratner, Martha M. McBrayer, Benedict P. Morelli & Associates, P.C., for Plaintiff.

Scott S. Balber, John Q. Kelly, Kelly & Balber LLP, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as

amended,[1] the New York State Human Rights Law (the "NYSHRL"),[2] the Americans With Disabilities Act of 1990 (the "ADA"),[3] and the common law of New York. Discovery having been completed and a pretrial order filed, the matter is before the Court on defendants' motion for summary judgment dismissing the complaint.

## I. Background

The general outline of plaintiff's relationship with defendants Plaza Construction Corporation ("Plaza"), Fisher Brothers ("FB"), and Steven Fisher may be summarized briefly.

Plaza hired Frank as a director of business development in August 1995 at a salary of $50,000 per year, but terminated her in August 1996. She was hired again in January 1998—Frank says as a result of defendants' pursuit of her and defendants say as a result of Frank's repeated supplications—as an account executive at a salary of $90,000 per year plus bonus. She received a raise in salary to $95,000 in July 1998 and a bonus of $15,000 at the end of the year. She was terminated on July 1, 1999.

Frank asserts the following claims:

• She was subjected to both hostile work environment and *quid pro quo* sexual harassment.

• She was a victim of gender-based disparate treatment in that she (a) was not made a vice president as allegedly promised when she was rehired in 1998, (b) was paid less than her male peers, (c) was excluded from certain business meetings and business-related social events attended by male peers, (d) did not receive secretarial assistance comparable to that of her male peers, and (e) was asked to take notes at meetings and otherwise treated in a demeaning fashion in comparison to her male peers.

• She suffered from a "disability" within the meaning of the ADA—dyslexia—but was not afforded reasonable accommodation.

• The complaint alleges that Frank was fired in retaliation for her pursuit of internal complaints of sexual harassment and gender discrimination.[4] In the joint pretrial order, she contends that the termination was in retaliation for complaining of gender and disability discrimination and for refusing to comply with Fisher's sexual advances.[5] In her papers in opposition to defendants' motion, she asserts only that the firing occurred because "Plaza became suspicious she had retained an attorney regarding the discrimination and sexual harassment she endured at Plaza."[6]

## II. Sexual Harassment

### A. Timeliness

Title VII generally requires that one complaining of employment discrimination file a charge with the Equal Employment Opportunity Commission ("EEOC") no later than either 180 or 300 days, depending on state antidiscrimination law and remedies, of an alleged unlawful employment practice.[7] The parties here agree that the date of the last alleged harassment of plaintiff by Fisher

---

1. 42 U.S.C. § 2000e *et seq.*

2. N.Y. EXEC. L. § 290 *et seq.*

3. 42 U.S.C. § 12101 *et seq.*

4. Am. Cpt. ¶ 55.

5. Joint pretrial order ("PTO") at 3, ¶ 10.

6. Pl. First 56.1 St. (included within DI 34) at 6.

7. *See* 42 U.S.C. § 2000e–5(e); *Dezaio v. Port Auth. of N.Y. and N.J.*, 205 F.3d 62, 65 (2d Cir.), *cert. denied*, 531 U.S. 818, 121 S.Ct. 56, 148 L.Ed.2d 24 (2000).

was December 18, 1999.[8] Defendants maintain that plaintiff filed her EEOC charge on October 28, 1999, more than 300 days later. From this premise, they would have the Court conclude that plaintiff's sexual harassment claims are untimely, irrespective of which period applies.[9] The argument, however, is not without its problems.

To begin with, plaintiff's sexual harassment claims do not depend upon Fisher's alleged behavior alone. The complaint and, perhaps, the joint pretrial order both are broader.[10] And while plaintiff's papers in opposition to this motion focus almost exclusively on Fisher, they are not strictly so confined. Defendants, however, have trained all their fire on the Fisher allegations and thus have failed to sustain their burden of establishing that there is no genuine issue of material fact concerning plaintiff's contention that a hostile work environment existed, even during the 180 or 300 days immediately preceding the filing of the EEOC complaint.

The second problem is that defendants' premise that the EEOC charge was filed on October 28, 1999—though entirely understandable given the submission of an affidavit by plaintiff's counsel that so placed the date—has been questioned. In response to the motion, plaintiff came forward with what purported to be a print out from an EEOC database perhaps suggesting that the charge was filed as early as October 12, 1999, less than 300 days after the final Fisher incident. The Court therefore held an evidentiary hearing in an effort to determine the authenticity and admissibility of the document at which two EEOC staff members testified.[11] Having heard the evidence, the Court finds that the evidence is sufficient to permit a finding that the document is authentic, that at least two of the three elements of the foundation required to admit it as a business record under Rule 803(6) are satisfied, and that a reasonable trier could find that the charge was filed on October 12, 1999 assuming the document were received in evidence. The question, however, is whether the information concerning the filing date was entered into the database "by, or from information transmitted by, a person with knowledge" of the date of filing, as required by the rule—a question rendered troublesome by a paucity of evidence and the fact that the original charge and any documents relating to it were destroyed in the attack on the World Trade Center.

If anything substantial now turned on the answer to that question, the Court would be obliged to decide it. But that is not the case. For one thing, the statute of limitations with respect to plaintiff's NYSHRL sexual harassment claim is three years,[12] so the dismissal of the paral-

---

**8.** Frank Dep. 556–57; Frank Aff. ¶ 17 (Balber Aff. Ex. L).

**9.** Defendants contend that the 180 day period applies here because, for some reason, plaintiff's EEOC charge was not referred to the New York State Division of Human Rights ("NYSDHR"), as typically is done. Plaintiff responds that plaintiff's filing with the EEOC in New York triggered the 300 day period without regard to whether the complaint in fact went to the NYSDHR. Tr., Feb. 5, 2002, at 40–41.

**10.** Am. Cpt. ¶¶ 23, 25–27, 35–38, 42; PTO at 3, ¶ 6.

**11.** FED. R. CIV. P. 56(e) requires that evidence in support of and in opposition to summary judgment motions be admissible in evidence. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123 (2d Cir.2001); *Raskin v. Wyatt*, 125 F.3d 55, 66 (2d Cir.1997); These are preliminary questions for the Court. FED. R. EVID. 104(a).

**12.** *E.g.*, *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997); *Martinez–Tolentino v. Buffalo State College*, 277 A.D.2d 899, 715 N.Y.S.2d 554, 555 (4th Dept.2000); *see* N.Y. CPLR § 214, subd. 2.

lel Title VII claim could eliminate proof of events prior to the statutory period only if the Court were to decline supplemental jurisdiction over the state claim, a course that would be inappropriate unless, perhaps, the entirety of the federal gender discrimination case were dismissed.[13] Perhaps even more to the point, it is entirely likely that proof of events prior to the statutory period would be relevant even if plaintiff were entitled to remedies only with respect to events within that period.[14]

■ In these circumstances, it would make little sense for the Court to reach out to decide a troublesome issue concerning the admissibility of computer generated records in the wake of the World Trade Center attack, an issue likely to affect any number of other cases, as the decision would be unlikely to have any practical impact on this case. There is no basis for concluding that the NYSHRL claim or so much of the Title VII gender discrimination claim in general or the sexual harassment claim in particular, as the latter relate to the statutory period preceding the filing date of the EEOC charge, is untime-

ly. The overlap of proof between the timely claims and any untimely claim is likely to be complete or nearly so. In consequence, there will be time enough to decide the evidentiary question at trial or in determining relief, should either prove necessary. The Court therefore declines to dismiss the Title VII sexual harassment claims as untimely.[15]

### B. Sufficiency of Quid Pro Quo *Sexual Harassment Claim*

■ To make out a claim of *quid pro quo* sexual harassment, a plaintiff must allege that (1) she was subject to unwelcome sexual conduct or an unwelcome sexual advance, and (2) her reaction to that conduct was used as the basis for an adverse employment action.[16] Defendants maintain that plaintiff alleges no adverse employment decision resulting from her refusal to submit to Fisher's alleged sexual advances.

■ Defendants are correct in suggesting that it is difficult to determine exactly what allegedly adverse employment action plaintiff attributes to her rebuffs of Fisher.

---

**13.** *See* 28 U.S.C. § 1367(c).

**14.** *E.g., Fitzgerald v. Henderson,* 251 F.3d 345, 365 (2d Cir.2001), *petition for cert. filed,* 70 U.S.L.W. 3163 (U.S. Aug. 29, 2001) (No. 01–373).

**15.** The strict application of the 180 or 300 day period is subject to the continuing violation doctrine which, in appropriate circumstances, delays the start of the period until the last act in a series constituting an unlawful employment practice. *See generally Fitzgerald v. Henderson,* 251 F.3d at 359; *Lightfoot,* 110 F.3d at 907; *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996); *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Johnson v. Nyack Hosp.,* 891 F.Supp. 155, 162–65 (S.D.N.Y.1995), *aff'd,* 86 F.3d 8 (2d Cir.1996). But plaintiff made no continuing violation argument in her EEOC charge, *see* Balber Aff. Ex. G ("continuing action" box on EEOC

charge form not checked), and makes none here. The complaint contains no such allegations. The joint pretrial order makes no such contention. When defendants relied upon the 300 day period in contending that the sexual harassment claims were untimely, plaintiff made no continuing violation argument in response. Even after defendants' reply memorandum specifically pointed out the lack of a continuing violation argument, Def. Mem. 4 n. 3, and after defendants argued in open court that no continuing violation argument had been advanced, Tr., Jan. 28, 2002, at 30, plaintiff made no such contention. In fact, when the Court inquired of plaintiff's counsel whether she was making a continuing violation argument with respect to the sexual harassment claim, he responded in the negative. Tr., Feb. 5, 2002, at 39.

**16.** *E.g., Fitzgerald,* 251 F.3d at 356.

Her contentions in the pretrial order baldly assert that she was fired in part for that reason. But that claim is not made in the papers submitted in opposition to this motion. Once again, however, defendants—aided by plaintiff's diffuse presentation—view her case too narrowly.

According to plaintiff, Fisher personally recruited Frank to return to Plaza for her second term of employment, promising her that she would be "coming back as vice president of business development" and promising her a salary of $140,000 and a bonus based on construction projects she brought in.[17] When she arrived, her salary was lower than promised and she did not receive the vice presidential title, commissions, or other allegedly promised benefits. She confronted Fisher in his office. According to Frank, the following ensued:

"A I was very upset by everything. And he locked the door behind, he put his arms around me, he was hugging me and saying, Wendy, it's going to be fine, it's all going to work itself out, you just can't come back her and expect everything to be handed with [*sic*] you. There's guys upstairs who've worked really hard for a really long time, you have to earn it . . .

"He started to hug me, you're going to be fine, it's all going to be perfect, it's going to work out great, get settled in, don't make too many waves, and hugging me, and its good to have you back.
"Q   Anything else?
"A He had an erection in his pants.
"Q   Did he point that out to you?
"A 'Can't you feel it.' "[18]

For purposes of this motion, the Court is obliged to credit this testimony as well as Frank's account of frequent sexual ad-

vances by Fisher. It is obliged also to deny this motion unless it is convinced that no reasonable jury could infer a connection between Frank's rejection of Fisher's advances and adverse employment actions.

Here, the evidence of Plaza's failure to fulfill the salary, title and other commitments allegedly made by Fisher in the context of alleged persistent harassment—particularly given the testimony quoted above—would permit a trier of fact, if it believed Frank, reasonably to find that sex with Fisher was the *quid pro quo* for the promised salary and other emoluments. This aspect of the *quid pro quo* sexual harassment claim, at least, is sufficient.

### C.   Plaintiff's Subjective View

█ Defendants' brief seeks dismissal of the hostile work environment claim on the ground that plaintiff cannot establish that she subjectively so perceived the workplace.[19] They contend that her speech was filled with vulgar sexual references, she discussed pornography with co-workers, and that she generally was more of a contributor to than a victim of any atmosphere that might have been offensive to women. Defendants, however, have not asserted in their Rule 56.1 Statement that the material facts concerning this contention are undisputed. In consequence, this aspect of their motion cannot be granted.

### D.   Liability of Plaza and FB for Hostile Work Environment Sexual Harassment

█ Employers are not invariably strictly liable for sexual harassment by their employees. When no tangible employment action is taken against an employee who has been subjected to hostile work environment sexual harassment, the

---

**17.**   Frank Dep. 24–26, 48–49, 174–75, 863.

**18.**   *Id.* at 496–97.

**19.**   *See, e.g., Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Ramos v. Marriott Int'l, Inc.,* 134 F.Supp.2d 328, 348 (S.D.N.Y.2001).

employer nevertheless may escape liability, even where the hostile environment is created by a supervisor with authority over the employee, if it demonstrates that (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer.[20] Plaza contends that its employee handbook set forth a policy proscribing sexual harassment and a procedure for complaints of its violation, but that plaintiff unreasonably failed to follow the prescribed procedure.[21]

Although the terms "hostile work environment" and "*quid pro quo* sexual harassment" are of "limited utility," they nevertheless are of some help in describing the particular type of conduct at issue.[22] And plaintiff's position is rather imprecise in that it conflates the two somewhat different theories of liability. Her *quid pro quo* claim is that she was subjected to adverse employment action because she rejected the advances of her supervisor, Fisher. If that occurred, Plaza, as plaintiff maintains, is strictly liable for his conduct. Indeed, Plaza does not suggest otherwise. But the hostile work environment claim, to some extent, is something else again. Of course, to the extent that she contends that the

workplace was hostile by virtue of Fisher's actions, the two theories of recovery blend into one another.

■ To the extent that Frank is complaining of a hostile work environment created by the actions of persons other than Fisher—and she does complain of an atmosphere allegedly permeated with "degrading comments, sexual banter, offensive jokes and sexual harassment against women"[23]—there is a genuine issue of fact precluding summary judgment based on the *Faragher/Ellerth* affirmative defense. Plaza's employee handbook directs employees experiencing sexual harassment to report the matter to Michael Paese and provides his telephone number (apparently contemplating an oral complaint).[24] Plaintiff stated in an affidavit that she complained to Michael Paese about inappropriate conduct in the workplace on "approximately a dozen occasions from March–April 1998 until the end of [her] employment."[25] Frank's deposition testimony reiterates this contention.[26] Frank asserts also that she complained to Steven Fisher and Richard Wood about Peter Hulbert's conduct and Michael Paese's comments and behavior.[27] Defendants respond that these alleged complaints do not "relate to any unlawful employment practice by Plaza" and that "her complaints of

---

**20.** *See Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d Cir.2001); *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 293–96 (2d Cir.1999), *cert. denied sub nom. Metro–North Commuter R.R. Co. v. Norris,* 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000).

**21.** Def. Mem. 26; Frank Dep. 817–18.

**22.** *See Ellerth,* 524 U.S. at 751, 118 S.Ct. 2257.

**23.** Pl. Mem. i.

**24.** Balber Aff. Ex. G, at 7. Defendants' argument that plaintiff failed to comply with Pla-

za's formal complaint procedures because she did not fill out the appropriate form is without merit. They improperly conflate the requirements set out in the employee handbook section entitled "Formal Problem–Solving Procedure" with those set out in the section entitled "Harassment."

**25.** Frank Aff. ¶ 18 (Balber Aff. Ex. L).

**26.** Frank Dep. 587 (indicating that Frank reported to Michael Paese her problems with "Peter Hulbert's behavior towards me, Mary Beth and mostly Jolene," as well as "April Lane's dress code").

**27.** *Id.* 587–88; Frank Aff. ¶ 31 (Balber Aff. Ex. L); *see also id.* ¶ 29 (detailing Paese's allegedly improper comments to plaintiff).

broken promises regarding unpaid commissions and withheld promotions are merely an attempt to bootstrap a flawed breach of contract claim into a Title VII action."[28]

The record does not warrant defendants' confidence regarding the scope of plaintiff's alleged complaints. Because a reasonable trier of fact could disagree with defendants' view of the alleged complaints, there is a genuine issue of fact regarding whether Frank "completely failed to avail herself of the complaint procedure,"[29] at least for her claim of a hostile work environment created by the actions of persons other than Fisher.

The applicability of the *Faragher/Ellerth* affirmative defense presents a more difficult question when it comes to plaintiff's claim of a hostile work environment created by Fisher's actions. Plaintiff acknowledges that she never reported Fisher's conduct to anyone at Plaza,[30] and thus it might be argued that she failed to avail herself of the company's complaint procedures with respect to his actions. It may be a mistake, however, to consider the alleged hostile environment created by Fisher's actions separately from any hostile environment created by others at Plaza. Although plaintiff names Fisher as the most egregious offender, if her story is believed then his conduct was part and parcel of a larger pattern of conduct at Plaza.[31] Viewed in this way, it would be

unfair and unwise to require Frank to complain about every specific alleged act of misconduct in order to defeat the *Faragher/Ellerth* affirmative defense. In the Title IX context, this Court has made a similar point with respect to the requirement of "actual knowledge":

> "Clearly, the institution must have actual knowledge of at least some incidents of harassment in order for liability to attach, as this is the thrust of *Gebser*. It is equally evident, however, that actual knowledge of every incident could not possibly be required, as this would burden the plaintiff unfairly in cases of frequent harassment to report many separate incidents to the appropriate authorities and would oblige the court to determine whether each incident alleged was reported and therefore is actionable. Suffice it to say, in light of *Gebser*, that the institution at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based."[32]

As in the Title IX context, a primary policy concern behind the *Faragher/Ellerth* affirmative defense is to provide notice to potentially offending organizations in order to prevent harm.[33] Here, if plaintiff did in fact complain about improper overtures and comments by other execu-

---

**28.** Def. Reply Mem. 8.

**29.** *Leopold,* 239 F.3d at 246.

**30.** Frank Aff. ¶ 18 (Balber Aff. Ex. L).

**31.** *Cf. Fitzgerald v. Henderson,* 251 F.3d at 365 (explaining that in hostile work environment cases district courts should not look at the record in a piecemeal fashion but rather consider all of the circumstances).

**32.** *Crandell v. New York Coll. of Osteopathic Med.,* 87 F.Supp.2d. 304, 320 (S.D.N.Y.2000).

**33.** *Compare Faragher v. City of Boca Raton,* 524 U.S. 775, 806, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (explaining that Title VII's "primary objective" is not to provide redress but to prevent harm), *with Crandell,* 87 F.Supp.2d at 319–20 (explaining that policies underlying Title IX primarily seek to put an end to discriminatory practices rather than to compensate all victims of harassment) (citing *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 287, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)).

tives, then the company may have been on notice about the type of conduct plaintiff claims Fisher engaged in. Assuming some temporal nexus between plaintiff's alleged complaints about other executives and Fisher's conduct,[34] the company "could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based."[35] Thus, it arguably was unnecessary for plaintiff to have complained specifically about Fisher's conduct in order to establish that she availed herself of Plaza's complaint procedures regarding the alleged hostile work environment as a whole.

▮ Moreover, even assuming *arguendo* that the Court should view any hostile work environment created by Fisher's actions separately from any hostile work environment created by others at Plaza, defendants would not be entitled to judgment as a matter of law on their *Faragher/Ellerth* defense with respect to Fisher's actions. In analyzing whether an employee acted unreasonably in failing to avail herself of an employer's complaint procedures, the Second Circuit employs a burden-shifting analysis.[36] Once a defendant has carried its initial burden of demonstrating that an employee has failed to avail herself of the available complaint procedures, the burden shifts to the plaintiff

come forward with one or more reasons why she did not make use of the procedures.[37] An employee's "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint" satisfies the employee's burden of production.[38] However, "a credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints."[39] Conclusory allegations of fear fail as a matter of law.[40]

▮ Here, plaintiff contends that she failed to report Fisher's conduct because she felt that "there was nobody I could turn to" and that "I would be fired if I reported his conduct."[41] While plaintiff's proffered explanations come close to being merely conclusory, she has adduced some evidence which, if believed, would permit a trier of fact to conclude that her fear was reasonable. First of all, there is Fisher's position as chairman of the board and chief executive officer. A plaintiff's claim that she or he has been sexually harassed by such a high-ranking official may itself be enough to create a jury issue.[42] Even if Fisher's status were not

---

**34.** It is not entirely clear from the record when plaintiff allegedly complained about other executives and at what time Fisher's alleged conduct occurred. Plaintiff does assert that she complained several times to Paese starting in March–April 1998 and continuing until her termination. Frank Aff. ¶ 18 (Balber Aff. Ex. L). As noted above, the parties agree that the date of the last alleged harassment of plaintiff by Fisher was December 18, 1999. Frank Dep. 556–57; Frank Aff. ¶ 17 (Balber Aff. Ex. L). Thus, a reasonable jury could find that plaintiff began complaining about other executives while Fisher's conduct was going on.

**35.** *Crandell,* 87 F.Supp.2d. at 320.

**36.** *Leopold,* 239 F.3d at 246.

**37.** *Id.*

**38.** *Caridad,* 191 F.3d at 295.

**39.** *Leopold,* 239 F.3d at 246.

**40.** *Id.*

**41.** Frank Aff. ¶ 18 (Balber Aff. Ex. L).

**42.** *See, e.g., O'Dell v. Trans World Entmt. Corp.,* 153 F.Supp.2d 378, 392 (S.D.N.Y.2001) (finding insufficient as a matter of law plaintiff's proffered justification that the CEO had cursed in her presence, but noting that

itself sufficient, plaintiff asserts in her affidavits and deposition testimony that she complained to Paese, Fisher, and Wood about the inappropriate conduct of other executives at Plaza, that they ignored her complaints, and that her complaints even provoked heightened hostility towards her.[43] As noted above, plaintiff appears to have made these complaints contemporaneously with at least some of Fisher's alleged conduct.[44] Taken together, Fisher's high-ranking status and the allegedly chilly reaction to her complaints could justify a finding that her failure to report Fisher's conduct was reasonable. Thus, Plaza has failed to demonstrate the absence of a genuine issue of material fact as to the reasonableness of plaintiff's failure to complain about Fisher's conduct.[45]

### III. Retaliatory Discharge

■ Retaliatory discharge claims are analyzed pursuant to the burden-shifting analysis of *McDonnell Douglas*.[46] In order to make out a *prima facie* case, plaintiff must establish that (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII, (2) the employer was aware of that activity, (3) she suffered an adverse employment action,

and (4) there was a causal connection between the protected activity and the adverse employment action.[47] Defendants maintain that plaintiff cannot establish any causal connection between her termination and any protected activity.

As indicated above, plaintiff's retaliatory discharge claim has been a moving target in the sense that plaintiff at different times has claimed that she was fired because she complained about gender discrimination and sexual harassment, because she was suspected of having hired an attorney in connection with such complaints, and because she would not have sex with Fisher. Whatever her precise claim, defendants have a very different explanation, contending that she was fired for gross insubordination and unprofessional conduct. But there is no need to get that far.

■ Certainly the record establishes that plaintiff was not fired for complaining of sexual harassment by Fisher. Plaintiff maintains that she was afraid to complain because Fisher was the chief executive officer and her chief harasser, and she admitted at her deposition that she never said anything about his alleged actions to anyone at Plaza during her employment there.[48]

"[p]laintiff has not alleged that the CEO sexually harassed her or in any way condoned sexual harassment by others"); *Meng v. Ipanema Shoe Corp.*, 73 F.Supp.2d 392, 402 (S.D.N.Y.1999) (denying summary judgment on affirmative defense where sexual harassers were high-ranking officers of corporation who threatened to fire plaintiff if she reported their harassment).

43. *Id.* ¶¶ 26–31.

44. *Supra* note 34.

45. Plaintiff appears to maintain that she was employed by FB as well as Plaza, although at other points she plainly acknowledges that her employment was by Plaza. *Compare, e.g.,* Def. 56.1 St. ¶ 1, *with* Pl. Response to 56.1 St. ¶ 1. The substance of her argument probably is that FB and Plaza come under the single employer doctrine by virtue of the integration

of the two operations, and defendants so assume for purposes of this motion. *See id.* ¶ 12. The point, however, is academic. In order to prevail on the *Faragher/Ellerth* affirmative defense, the employer must demonstrate that it took appropriate steps to prevent and correct sexual harassment. FB has made no such showing. It therefore is not entitled to summary judgment.

46. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

47. *E.g., Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996).

48. Frank Dep. 229–33, 828–29.

The question whether Frank was fired for complaining about Fisher's sexual harass-

Nor was she fired for hiring a lawyer in connection with any complaints of discrimination. The very testimony on which Frank relies demonstrates that Richard Wood, president of Plaza, became upset when Michael Paese told him that he believed that Frank was consulting an attorney in connection with negotiations between Plaza and Frank concerning a compensation agreement.[49] In a subsequent meeting, Frank screamed at Wood, whereupon she was fired. Indeed, to quote Frank, in discussing the compensation agreement, "It was being negotiated. *I got fired over that.*" [50]

■ To be sure, plaintiff allegedly did complain to Fisher and a few others about her compensation, especially her 1998 bonus, the failure to make her a vice president,[51] and in a number of instances about other matters, including alleged behavior by Peter Hulbert that might be regarded as gender related discrimination.[52] The question is whether these complaints can support a retaliatory discharge claim.

■ Many of these complaints were made many months before plaintiff was terminated. While the Second Circuit has not adopted a bright line test as to when the time interval between the protected activity and the adverse employment action grows too long to permit an inference of a causal connection between them,[53] it surely is fair to say that the length of time is a relevant and often quite important consideration, although it must be taken together with other relevant circumstances. Taking the time interval together with plaintiff's statement that she "got fired over" her shouting match with Wood, no reasonable inference of a causal connection between many of the complaints and her termination could be drawn. Nevertheless, plaintiff's evidence concerning the timing of her complaints about Hulburt is vague, so it is possible that some of these took place closer to the time of her discharge. While a claim of retaliatory discharge based on any complaints regarding Hulburt seems weak, the Court cannot exclude the possibility that plaintiff might adduce evidence that would justify a trier reasonably to find them to have been a motivating factor in her termination. Accordingly, the retaliatory discharge claim, to the extent it rests on alleged complaints about sexual harassment by Hulburt, will stand.

*IV. The Disparate Treatment Claim*

■ Plaintiff alleges that she was not treated as well as her alleged male peers in a number of respects. She was paid less, did not receive the title vice president, was not invited to certain business lunches and sports events at which clients were entertained, was given a less desirable office, and was assigned to tasks she found demeaning.[54] Apart from her assertions, there is precious little evidence to support these claims and, as far as com-

---

ment, and thus in retaliation for engaging in activities protected by Title VII, is distinct from the question whether her refusal to have sex with him was a factor in her termination. This latter grievance, if plaintiff properly may be regarded as advancing it, could be an aspect of her *quid pro quo* sexual harassment claim.

**49.** Paese Dep. 108–12; Frank Dep. 410–11; *see id.* at 607–08.

**50.** *Id.* at 411 (emphasis added).

**51.** Fisher Dep. 47–48, 52, 56; Frank Dep. 179–83, 486–87.

**52.** Frank Dep. 587–88; Frank Aff. ¶¶ 26–27 (Balber Aff. Ex. L).

**53.** *Gorman–Bakos v. Cornell Coop. Ext. of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001).

**54.** Pl. First 56.1 St., at 15–20.

pensation is concerned, there is no reason to suppose that she has personal knowledge of what her alleged peers were paid. Defendants seek dismissal. But they have come forward with little evidence of their own. Strikingly, for example, they have not offered evidence of what plaintiff's alleged peers were paid or of who was invited to attend the various events in question. Nor have they addressed these matters, which obviously are material to their motion, in their Rule 56.1 statement.

[redacted] Rule 56.1 requires that one moving for summary judgment provide a statement of the material issues of fact that it contends are undisputed together with references to the evidence of record supporting each assertion. Failure to comply with the rule is reason enough to deny the motion.[55] As defendants have not complied with the rule, and as the facts concerning the disparate treatment claim are far from clear, this aspect of defendants' motion will be denied.

### *V. The ADA Claim*

Plaintiff claims that she is disabled within the meaning of the ADA in that she is dyslexic and that defendants failed reasonably to accommodate her needs. Defendants seek summary judgment dismissing the ADA claim on a variety of grounds. This branch of their motion is meritorious.

Covered employers must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship."[56] A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds ...."[57] A "disability" in turn is:

> "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> "(B) a record of such an impairment; or
> "(C) being regarded as having such an impairment."[58]

[redacted] Defendants begin their attack by contending that there is no competent proof that plaintiff has an "impairment." The only evidence that she is dyslexic is her own assertion to that effect and her mother's statement that she was so diagnosed.[59] The mother's statement plainly is hearsay and therefore not properly considered on this motion.[60] Frank's own statement also is of dubious admissibility. To the extent that it is a repetition of a diagnosis given her by a qualified professional, it is hearsay. To the extent it is her own opinion, there has been no showing that she is qualified to make the diagnosis[61] or, although the point is less clear, that her self-diagnosis is "rationally based on the perception of the witness."[62] But there is no need to rest on this point, for even if Frank has an impairment, there is no evi-

**55.** *See* S.D.N.Y. CIV. R. 56.1(a).

**56.** 42 U.S.C. § 12112(b)(5)(A).

**57.** *Id.* § 12111(8).

**58.** *Id.* § 12102(2).

**59.** Frank Dep. 162–63; D. Frank Dep. 29–30. There is evidence also that plaintiff attended a school specializing in students with learning disabilities. Balber Ex. G (records attached to EEOC charge).

**60.** *See supra* note 11.

**61.** *See* FED. R. EVID. 702 (expert witness must be qualified "by knowledge, skill, experience, training or education").

**62.** *See id.* 701.

dence that she is "disabled" within the meaning of the ADA.

"Merely having an impairment does not make one disabled for purposes of the ADA."[63] "Claimants also need to demonstrate that the impairment limits a major life activity" and that the limitation is "substantial."[64] As the regulations make clear, the following factors are pertinent in determining the substantiality of the impairment: "(i) The nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."[65]

The Court assumes that it properly may notice[66] the following definition of dyslexia:

"Dyslexia is a brain-based type of learning disability that specifically impairs a person's ability to read. These individuals typically read at levels significantly lower than expected despite having normal intelligence. Although the disorder varies from person to person, common characteristics among people with dyslexia are difficulty with phonological processing (the manipulation of sounds) and/or rapid visual-verbal responding."[67]

And the key point is that "the disorder varies from person to person." For, in order for an impairment to constitute a disability, it must *substantially* impair a major life activity of the plaintiff. "The word 'substantial' . . . clearly precludes impairments that interfere in only a minor way with the performance of major tasks from qualifying as disabilities."[68] And here there is no evidence that Frank's dyslexia substantially impairs any major life activity. Her affidavits say in conclusory terms that she has "difficulty with reading and writing,"[69] and particularly writing.[70] In her deposition she testified only that "in writing, my spelling, my grammar, I'm slower and I don't—since I didn't learn to read and things at such a late date, I have a learning gap."[71] But she testified also that she could perform her duties at Plaza.[72] She left blank the space on the Plaza employment application that asked whether there was "any reason why you cannot perform the essential duties of the position for which you're applying."[73] And her treating physician testified that Frank did not exhibit any symptoms of dyslexia.[74]

On a motion for summary judgment, the moving party must establish the absence of a genuine issue of material fact. But this requirement is not independent of the identity of the party that bears the burden of proof at trial. Where, as here, the burden of proof on an issue at trial lies with the non-moving party, it is sufficient

63. *Toyota Motor Mfg. Ky., Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002).

64. *Id.*

65. 29 C.F.R. § 1630.2(j)(2)(i)-(iii) (2001).

66. *See* FED. R. EVID. 201.

67. National Institute of Neurological Disorders and Stroke, *NINDS Dyslexia Information Page, at* http://www.ninds.nih.gov/health_and_medical/disorders/dyslexia_doc.htm (last visited Feb. 20, 2002).

68. *Toyota Motor,* 534 U.S. at ——, 122 S.Ct. at 691.

69. Frank Aff. ¶ 7 (Balber Aff. Ex. D).

70. Balber Aff. Ex G (EEOC charge).

71. Frank Dep. 912.

72. *Id.* 163.

73. *Id.*

74. Jones Dep. 62.

for the moving party to point to a lack of evidence on the issue sufficient go to the trier of fact. The non-moving party, in order to avoid summary judgment, then must come forward with admissible evidence sufficient to raise a genuine issue for trial.[75] Thus, the question is whether plaintiff's evidence would be sufficient to justify a trier of fact in concluding that her dyslexia *substantially* limits a major life activity. And there is no such evidence. The fact that Frank is slower at writing than others as a result of having learned to read later in life simply permits no such conclusion. Accordingly, the ADA claim will be dismissed.[76]

### VI. Conclusion

For the foregoing reasons, defendants' motion for summary judgment dismissing the complaint is granted to the extent that Count III, which contains the ADA claim, and the retaliatory discharge claim to the extent it rests on alleged protected activities other than complaints about alleged sexual harassment by Peter Hulburt are dismissed. The motion is denied in all other respects.[77]

SO ORDERED.

---

**75.** *E.g., Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when non-moving party bears burden of proof at trial, moving party is entitled to summary judgment if non-movant fails to make showing on essential element of its claim); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**76.** Frank, it should be noted, had a full opportunity to adduce additional evidence in her answering papers. She quite deliberately chose not to do so.

**77.** The Court has considered defendants' contention that plaintiff has adduced no sufficient evidence of damage and concluded that it is without merit.